**BANK LINE, Limited, v. PORTER et al.**

Circuit Court of Appeals, Fourth Circuit.
April 10, 1928.

No. 2620.

**1. Shipping ⟨⟩132(5⅛)—Evidence held to show steamship unseaworthy at commencement of voyage, due to neglect of owner; "seaworthiness."**

Evidence held, to show that steamship was unseaworthy at commencement of voyage, due to neglect of her owner; test of "seaworthiness" being whether vessel is reasonably fit to carry cargo which she has undertaken to transport.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaworthy—Seaworthiness.]

**2. Shipping ⟨⟩132(4)—Doubt as to seaworthiness of vessel must be resolved against owner and in favor of shipper.**

If there is any doubt as to the seaworthiness of a vessel, doubt must be resolved against owner and in favor of shipper.

**3. Shipping ⟨⟩121(1)—Certificate of seaworthiness did not absolve owner from neglect with regard to condition of vessel, where he possessed information which should have been communicated to surveyor.**

Certificate of seaworthiness issued by surveyor at place of commencement of voyage was not sufficient to absolve owner from neglect with regard to condition of vessel, where owner was in possession of information respecting history of vessel's voyage from G. to place of commencement of voyage, which should have been communicated to surveyor, but was not, since diligence required is diligence with respect to vessel, not in respect to obtaining certificate.

**4. Shipping ⟨⟩123(1)—Law imposes on shipowners duty of using due care to ascertain characteristics of goods offered for shipment, and to exercise due care in their handling.**

Law imposes upon owners of ships duty of using due care to ascertain and consider nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including such methods as their nature requires.

**5. Shipping ⟨⟩120—Neglect to take steps to prevent spontaneous combustion of jute, after delay of vessel, was directly chargeable to owner of vessel.**

Where owner knew, in addition to two months occupied by voyage, of long and unexpected delay in sailing of vessel after loading was completed, and of other delays during voyage, and also knew that cargo included jute, and of the hot climate in which vessel had been during such period, neglect to take steps to prevent fire by spontaneous combustion of jute was directly chargeable to owner of vessel, since knowledge of facts that may be reasonably expected to lead to certain results imposes a direct liability for those results.

**6. Shipping ⟨⟩132(5⅝)—Evidence that cargoes of jute were carried on longer voyages without spontaneous combustion held irrelevant, where spontaneous combustion of jute resulted in instant case, causing damage to cargo.**

In suits for loss of or damage to cargo, evidence that cargoes of jute under different circumstances were carried on longer voyages without any resulting spontaneous combustion held, irrelevant, where spontaneous combustion of jute did result in instant case, under conditions that existed, causing damage to cargo.

**7. Shipping ⟨⟩120—That cargo was handled with joint assent of representatives of cargo owners after first fire did not excuse vessel owner for prior negligence.**

That cargo was handled with joint assent of representatives of cargo owners after first outbreak of fire did not excuse vessel owner for its negligence prior to first fire.

**8. Shipping ⟨⟩138—Statutory exemption from liability for fire loss did not apply, where owner was negligent, and where he contracted against such loss (46 USCA § 182).**

Comp. St. § 8020 (46 USCA § 182), exempting owner of vessel from liability for loss or damage to cargo by fire, does not apply where owner contributed to loss by his own neglect in permitting vessel to sail in unseaworthy condition, and in not taking steps to prevent spontaneous combustion, and where owner, under terms of bill of lading, expressly contracted that it would be responsible for loss by fire, should vessel be unseaworthy.

**9. Shipping ⟨⟩141(1)—Right of vessel owner to contract against benefits conferred by fire statute exists, but intention must be plain (46 USCA § 182).**

Intention of owner of vessel to contract as against benefits conferred by fire statute (Comp. St. § 8020; 46 USCA § 182), must be plain and explicit, but right to so contract exists.

**10. Shipping ⟨⟩121(1)—Unseaworthiness of vessel, causing delays in voyage, held to be proximate cause of fire caused by spontaneous combustion in cargo of jute.**

Unseaworthiness of vessel, which caused delay in voyage long enough for incubation of fire by spontaneous combustion of jute in cargo, held to be proximate cause of fire.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Suits by Harry G. Porter, trading as H. & L. Chase, and others, against the Bank Line, Limited. Decree for libelants (17 F. [2d] 513), and defendant appeals. Affirmed.

Charles R. Hickox, of New York City (Edward R. Baird, Jr., of Norfolk, Va., John M. Woolsey, Clement C. Rinehart, and Kirlin, Woolsey, Campbell, Hickox & Keating, all of New York City, and Baird, White &

Lanning, of Norfolk, Va., on the brief), for appellant.

D. Roger Englar, T. Catesby Jones, and J. M. Richardson Lyeth, all of New York City (Henry H. Little, of Norfolk, Va., Henry N. Longley, Bigham, Englar & Jones, and Carter, Ledyard & Milburn, all of New York City, and Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellees.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

NORTHCOTT, Circuit Judge. This is an appeal from an interlocutory decree in admiralty made in the District Court of the United States for the Eastern District of Virginia, and in this opinion the appellant will be referred to as the respondent, and the appellees as libelants. The opinion of the learned trial judge upon which the decree was based, will be found in The Poleric, 17 F.(2d) 513. The statement of facts, set out at some length in the opinion below, need not be restated here, with the possible exception of the history of occurrences that took place between the arrival of the Poleric at Ponta Delgada, on January 1, 1921, and her arrival at Rotterdam, on the 30th day of April following. With respect to this interval, it may be noted the vessel arrived at Ponta Delgada in a badly crippled condition, and lay in that port, undertaking repairs, until the 15th day of February, when fire, evidently caused by spontaneous combustion in its cargo of jute, broke out in the after part of the starboard side of No. 4 shelter deck. From that time until the 15th day of April, there were numerous outbreaks of fire, evidently from the same cause. The vessel left Ponta Delgada on April 20, and arrived at Rotterdam on April 30.

The decree complained of fixed liability on the respondent for loss by damage to the cargo, on the ground that the vessel was unseaworthy at the time it sailed from Calcutta. In case where, as in this one, there is a great mass of evidence, there are usually certain facts that are outstanding and that are decisive of the principles involved. Am. Bell Tel. Co. v. People's Tel. Co. (C. C.) 22 F. 309.

In this case there are over 2,000 printed pages of record, and to enter into a detailed discussion of the evidence, as to all the points covered, would be useless and unnecessary. There are certain points of importance necessary to be considered in reaching a conclusion, and among these, and of the greatest importance, is the question of the seaworthiness of the Poleric when she left Calcutta. The question of seaworthiness once concluded, the field of discussion, not only as to conclusions of fact, but of law, is much narrowed.

With regard to the history of the Poleric's voyage from Greenock to Calcutta the trial judge says: "Was the vessel seaworthy at the commencement of the voyage? When the Poleric left the Clyde in 1920, she was a vessel 20 years of age, then reconditioned at very large expense, officially surveyed, and, presumably, in all respects seaworthy. Her boilers were new; her engines had been removed, taken ashore, opened up, and surveyed. Many of her auxiliaries had been removed, sent to the makers, and overhauled, and apparently everything done which was necessary to make the vessel staunch, safe, and in all respects seaworthy. Under these circumstances she sailed for New York, and almost immediately from that time until her final disaster in mid-Atlantic, resulting in her forced return for harbor in the Azores, she experienced a succession of machinery and boiler troubles that has no parallel in the record of any similar vessel within my knowledge." The Poleric, supra.

In reaching this final conclusion on the question of the vessel's seaworthiness, the judge says: "It is obvious that the deep-seated trouble which the vessel suffered after the reinstallation of her machinery existed at Greenock and continued until Rotterdam; that this trouble evidenced itself in ways which should have called attention to it; that at every stopping port, and especially at Calcutta, the means were at hand to determine where the trouble lay; that knowledge of this condition was brought home to the owner in the frequent reports already adverted to; and that the failure to determine the trouble and apply the remedy, not only made the ship unseaworthy, but was negligence directly attributable to the owner, and for which the ship is liable. Asiatic Petroleum Co. v. Lennard's [1914] 1 K. B. 419–424, [1915] A. C. 705, supra; Hines v. Butler (C. C. A.) 278 F. 877." The Poleric, supra.

[1-3] In the case of The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, Mr. Justice Gray said: "The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport."

Measured by this test, we agree with the learned judge below that the Poleric was not seaworthy, and that her unseaworthiness was due to the neglect of her owner.

If there is any doubt as to the seaworthiness of the vessel, that doubt "must be resolved against the ship owner and in favor of the shipper." The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

It is contended, on the part of the respondent, that the certificate of seaworthiness issued by Lloyd's surveyor at Calcutta was sufficient to absolve the owner from any neglect with regard to the condition of the Poleric. We cannot agree with this 'contention. The owner was in possession of information respecting the history of the vessel's voyage from Greenock to Calcutta that should have been communicated to Lloyd's surveyor. This was not done.

The diligence required is "diligence with respect to the vessel, not in obtaining certificates." The Abbazia (D. C.) 127 F. 495; Compagnie Maritime Francaise v. Meyer (C. C. A.) 248 F. 881.

"Certificates of surveyors and inspectors giving high rating have been disregarded, where vessels have been found unseaworthy in fact." Compagnie Maritime Francaise v. Meyer, supra, citing the Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748.

That there was some fundamental and serious fault in the vessel seems conclusively proven by the history of the voyage from Greenock to Calcutta. Just what this fault was it does not seem necessary to determine. That it existed seems conclusively proven.

A study of the record in this case leads us to the conclusion that, on the question of seaworthiness, there was not only ample evidence to support the conclusion reached by the judge below, that the vessel was unseaworthy when it left Calcutta, but that the evidence necessarily leads to that conclusion, and on this point we agree with, not only the reasoning of the trial judge, but his conclusion.

[4] Having arrived at this conclusion, not much is left to be considered, but there is a phase of the case which, in our opinion, also affects the question of the liability of the respondent, and that is the neglect of the respondent to take proper precaution to prevent the happening of the very thing that did happen, the breaking out of the fires by spontaneous combustion.

"The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including * * * such methods as their nature require." So. Pac. Co. v. Walker-Smith, etc. (Tex. Civ.

App.) 257 S. W. 347; Willfaro-Willsolo (D. C.) 9 F.(2d) 940, affd. (C. C. A.) 9 F.(2d) 622; Arkell & Douglas v. U. S. (C. C. A.) 13 F.(2d) 555; Herman et al. v. C. G. T (C. C. A.) 242 F. 859.

"The dangers arising in the transportation of combustible material are greatly enhanced by the prolongation of the voyage. * * *" The Elizabeth Dantzler (D. C.) 263 F. 596.

"Owner not immune from liability for fire, where facts showed conditions long existing and which should have been provided against." Hines v. Butler (C. C. A.) 278 F. 877.

[5] The owners knew, in addition to the two months occupied by the voyage, of the long and unexpected delay in the sailing of the Poleric from Calcutta, where she lay 23 days, after the loading was completed; knew of the delay at Lisbon, where she was held 9 days for repairs; and knew of the long delay of 6 weeks at Ponta Delgada before any fire broke out. Knowing, as they also did, of the nature of the cargo, and the hot climate in which the vessel had been all this time, some steps should have been taken to prevent the very thing that did occur, the breaking out of the numerous fires by spontaneous combustion, and this neglect is directly chargeable to the owner. The fire was evidently caused by spontaneous combustion. Proper precaution on the part of the owner, such as the unloading or ventilating of the cargo, would unquestionably have avoided the fire.

[6, 7] Evidence that cargoes of jute, under different circumstances, were carried on longer voyages without any resulting spontaneous combustion, are not relevant, because we do know that spontaneous combustion did result in this case under the conditions that existed. A condition involving danger of fire, and known to the owner of the vessel, was permitted to exist through the owner's negligence, and while it is true that, after the first outbreak of the fire, the cargo was handled with the joint assent of representatives of the cargo owners, this does not excuse the respondent for its negligence prior to the first fire.

In this case, as in the case of The Elizabeth Dantzler, 263 F. 596, we are of the opinion that, taking into consideration the nature of the cargo and climatic conditions at Ponta Delgada, the fire was reasonably to be feared and provided against, if not to be expected. All these facts were in possession of the owners of the Poleric; their agents were on the ground, and no steps

taken to prevent the fire. Knowledge of facts that may be reasonably expected to lead to certain results imposes a direct liability for those results. The Eastern Glade (C. C. A.) 13 F.(2d) 555; Willfaro-Willsolo (D. C.) 9 F.(2d) 940.

The assistant superintendent engineer of the owner arrived at Ponta Delgada on January 14, more than a month before the first breaking out of the fire.

That the danger of carrying jute was inherent was well known to the respondent. This is shown by the special instructions issued by it with reference to the ventilation of vessels sailing from Calcutta with jute. [8, 9] It is contended on behalf of the respondent that it is exempted from liability by the fire statute. This statute is set out in full in The Poleric, supra. On this point we agree with the learned judge below, when he says: "In view, however, of the decision which I have reached on the subject of the seaworthiness of the Poleric at the commencement of the voyage, what is said above may after all be wholly academic since, if the ship was not seaworthy, and this fact was due to the personal negligence of the owner, and the failure in that respect was the cause of the loss, that of itself would make the statute inoperative. The Virginia (D. C.) 264 F. 986; Hines v. Butler (C. C. A.) 278 F. 877; The Elizabeth Dantzler (D. C.) 263 F. 596; Asiatic Petroleum Co. v. Lennard's Carrying Co., [1914] 1 K. B. 419–424, [1915] A. C. 705."

The fire statute does not apply where the owner has contributed to the loss by his own neglect. Walker v. Transportation Co., 3 Wall. 150, 18 L. Ed. 172. Here the owner, by its neglect in allowing the Poleric to sail from Calcutta in an unseaworthy condition, did contribute to the loss.

Again, under the terms of the bill of lading, which is set out in full in The Poleric, supra, the owner expressly contracted that it would be responsible for loss by fire, should the vessel be unseaworthy. The intention to contract as against benefits conferred by the fire statute must be plain and explicit, but the right to so contract clearly exists. Pendleton v. Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770.

In the Ingram-Royle Case, [1913] 1 K. B. 538, the court said: "It was competent for the shipowner to contract himself out of the benefits conferred by the statute, if he used apt words for that purpose in the bill of lading."

In this case the language is clear and explicit, and the intention to contract as against the fire statute in case of the unseaworthiness of the vessel, is plainly expressed.

We are of the opinion that the fire statute does not relieve the respondent's liability, not only because of the terms of the bill of lading, but because the fire statute itself does not relieve against the negligence of the owner.

[10] Finally, it is strongly contended on behalf of the respondent that the unseaworthiness of the vessel was not the proximate cause of the fire. But for the condition of the vessel causing delay in the voyage, the cargo would have been unloaded at its destination before the passing of the period evidently necessary for the incubation of the fire by spontaneous combustion.

The cases relied upon by the respondent, such as loss by fire caused by lightning, or loss by unusual severe storms, are not in point. In those cases the storm or the stroke of lightning might well have happened at any time, whether the vessel had been delayed or not, and, therefore, the delay was not the proximate cause. In this case the fire, caused as it was by spontaneous combustion, requiring the lapse of a certain period of time for incubation, was caused by the delay and the neglect of the owner to take proper precautions, and there is a direct causal connection between the delay and the fire. The G. R. Booth, 171 U. S. 450, 19 S. Ct. 9, 43 L. Ed. 234.

The case of R. D. Bibber (C. C. A.) 50 F. 841, relied upon by the respondent is not in point. There the court said that the grounding of the ship was the remote and the storm the proximate cause of the damage.

In this case the delay brought about by the unseaworthiness, due to the negligence of the owner, did bring on the fire, and was the proximate cause of the injury.

The Thessaloniki (C. C. A.) 267 F. 67, is relied upon by the respondent. In that case it was held that there was no evidence that the delay caused the damage. In this case the evidence is conclusive that the delay, caused by the unseaworthy condition of the Poleric, by giving the fire incubating time, caused the damage. The Pehr Ugland (D. C.) 271 F. 340.

We are of the opinion that the vessel, through the negligence of the owner, was unseaworthy when she sailed from Calcutta; that, had the owner taken the proper precaution, the damage could have been avoided at Ponta Delgada; and that the negligence of the owner was the direct and proximate cause of the injury.

The action of the court below in entering the decree complained of is affirmed.