REMINGTON RAND, Inc., Monsanto Chemical Co., Air Conditioning Corporation, A. T. Kajiji, S. A. T. Maskati and Z. T. Kajini, copartners doing business under the firm name and style of Garlick & Co., National Theatre Supply & Export Division, National Simplex Bludworth, Inc., A. H. Gandhi, General Motors India, Ltd., Amcorp, Ltd., Ismail Mohamed, Eastern Electric & Engineering Co., A. B. Rangwalla and The Williams & Wilkins Co.,

v.

## AMERICAN EXPORT LINES, Inc.

George REINHART, Werner Reinhart, Peter Reinhart and Balthasar Reinhart, copartners doing business as Volkart Brothers, S.S., White Dental Manufacturing Co., Upper India Trading Co., Ltd., Firestone Tire & Rubber Co. of India, Ltd., New Standard Chemicals Co., Ltd., American Auto Parts Co., Vishnu Cotton Mills, Ltd., Popular Book Depot, Modi Soap Works and Motor Sales Co.,

v.

## AMERICAN EXPORT LINES, Inc.

### N. J. KOTHARI
v.

## AMERICAN EXPORT LINES, Inc.

INTER UNION TRADERS, Ltd., and H. & B. American Machine Company,

v.

## AMERICAN EXPORT LINES, Inc.

The FAIRDEAL CORPORATION, Ltd. and Empiria Corporation,

v.

THE EXAMINER, her engines, boilers, etc., and American Export Lines.

## OMNI EXPORT CORPORATION
v.

THE EXAMINER, her engines, boilers, etc., and American Export Lines.

United States District Court
S. D. New York.
May 11, 1955.

Motion to Reopen Trial Denied
June 24, 1955.

Bigham, Englar, Jones & Houston, New York City, for Remington Rand, Inc. and others, F. Herbert Prem, New York City, of counsel.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for Fairdeal Corp., Limited, and others, Barton P. Ferris, New York City, of counsel.

Haight, Deming, Gardner, Poor & Havens, New York City, for respondent, James M. Estabrook and David P. H. Watson, New York City, of counsel.

RYAN, District Judge.

Libellants, each by separate suit, seek to recover for loss and damage to cargo shipped at New York in November and December, 1948 aboard the S.S. Examiner for carriage to Bombay, India; the six suits filed, alleging total cargo losses of $233,375, have been consolidated for trial.

It has been stipulated that libellants were the owners of cargo and holders of bills of lading issued therefor, and that the cargo sustained damage. It is not questioned that the cargo was delivered to respondent in New York in good order and condition and that respondent accepted the shipments and agreed to carry them on its vessel, S.S. Examiner to Bombay for delivery there to the respective consignees, in accordance with the valid terms of the bills of lading issued by respondent.

When the S.S. Examiner arrived at Bombay, the cargo in suit was discharged into lighters which had been hired by respondent from a Bombay stevedore by written contract which provided for hire payment to the owner of the lighters at scheduled rates. Fire occurred on the lighters while moored alongside the S.S. Examiner at Bombay on January 24, 1949 and resulted in damage to the cargo for which recovery is sought.

The origin of the fire is not in dispute; it broke out on one of the lighters from several steel drums containing washed 35 mm. film, which exploded and spread throughout the cargo aboard and to an adjoining lighter. These drums of film were part of a consignment of 36 similar drums which had been taken aboard the S.S. Examiner at New York and some of which had been discharged, on to the lighters, after arrival at Bombay. The film shipment had been made by Cellofilm Corporation, which is not a party to any of the present suits. The explosion and fire occurred by reason of spontaneous combustion, resulting from the decomposition of the film.

Trial presented the factual issue whether respondent exercised due diligence in stowing, caring for and protecting the drums of film, as required by the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(2) and the bills of lading; or whether it failed to do so thereby occasioning the fire and consequent cargo damage. From the resolution of this issue, the additional question arises whether, despite such failure, if found and, under the circumstances, respondent is released from liability under the fire exception of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304 (2) (b), or by virtue of the bills of lading.

The following facts are found as established by the evidence presented on trial:

1. The respondent owned and operated the S.S. Examiner as a general ship engaged in carrying cargo for hire from the Ports of New York and Baltimore to the Port of Bombay.

2. On November 30, 1948 the respondent issued its Dock Receipt to the Cellofilm Corporation for 36 drums which were delivered to the respondent on December 8, 1948, and on the day following it issued its Bills of Lading to Cellofilm Corporation covering this shipment which was described in the bill of lading as containing "Waste film (washed scrap 35 mm. film)" for carriage aboard the S.S. Examiner from New York to Bombay. The 36 drums were stowed in the No. 4 port trunk on December 11, 1948.

3. The 36 drums shipped by Cellofilm Corporation contained nitrocellulose-base waste, washed scrap, 35 mm. film. The Cellofilm Corporation had never shipped unwashed film. The gelatine or emulsion was removed from the film to recover the silver salts; the films were then rewound in reel form; the reels stood on end and cut through from the outer edge to the center to mutilate them; then they were placed in the steel drums, which met specifications prescribed by the Interstate Commerce Commission. The drums were of 18 gauge steel, 3 feet high, 2 feet in diameter and weighed 500 pounds fully packed. The drums were painted, heads blue and length black or red, and the heads were fitted with a well nigh air tight locking device. All were of the same type and had been found satisfactory for 25 years. The Cellofilm Corporation, to keep the film cool in summer months, stored them in specially constructed vaults, which had 1 foot thick solid concrete roofs, and built so as to

contain water which served to help keep out the heat of the sun. Experience showed that even the empty drums left to stand in the open at the Cellofilm Corporation yard on a hot summer day absorbed heat to such a degree that it was painful to retain one's hand upon one of them.

4. Each of the 36 drums of the shipment when stowed on board the S.S. Examiner had two yellow labels affixed to it, one on the top, the other on the side; the labels conformed to and met the requirements of the United States Coast Guard Regulations. These regulations entitled "Explosives or Other Dangerous Articles on Board Vessels", designate moving picture film scrap as a hazardous cargo, to be shipped under a yellow label. The instructions given in the regulations, in respect of scrap film, are:

"Consists of trimmings, clippings, and other waste obtained in the manufacture of proxylin plastic articles, or the scrap obtained from motion picture film, X-ray film and photographic film.

"Being finely divided, it is more hazardous than the original materials.

"Stow well away from all sources of heat. Protect from temperatures exceeding 100°F." (p. N–209)

There is no specific provision in the Coast Guard Regulations as to the storage of "waste" film. The regulations require that the described yellow labels be placed on "containers of inflammable solids and oxidizing materials" (p. N–54). Film scrap is an inflammable solid. The yellow label, illustrated on page N–55 of the regulations, contains the following:

"Caution

"Keep away from fire, heat, and open flame lights".

There is no difference between waste, junk or scrap film in so far as chemical reaction to heat is concerned.

5. No. 4 port trunk in which the 36 drums were stowed is a cargo space on the port side just forward of the main house of the S.S. Examiner. The trunk itself measures from the top of the coaming about 12 x 14 feet and 10 or 12 feet high. The coaming is 3 feet high and made of steel. The deck plates are also steel. There was a wood hatch covered with tarpaulins. The sides of the hatch cover were 10 x 12 feet, or 120 square feet. The trunk way was 2 feet larger, or 12 x 14 feet, a total of 168 square feet. The difference of the 48 square feet of steel deck plating, plus the square of the hatch, served as a deck over the 36 drums. The sides of the trunk are made of steel. There is no direct ventilation into the port trunk but it is surrounded on three sides by ventilated compartments and on the port side by a passageway with an access door. Cargo stowed in No. 4 port trunk is accessible either through the hatch or through the door.

6. The vessel proceeded from New York on December 11, 1948, via the Mediterranean, Red Sea and Indian Ocean, arriving at Bombay on January 8, 1949. The temperatures during the voyage were taken on the bridge wing; the thermometer was enclosed in a louvered box which protected the thermometer at all times from the sun. No temperatures were taken at mid-day. The highest free air temperatures recorded on the ship's bridge during the period it was proceeding through the Red Sea and Indian Ocean and until the removal of the said 36 drums from the trunk space at Bombay on January 8th were:

| December | 28 | 81° F. |
|----------|----|--------|
|          | 29 | 80° F. |
|          | 30 | 82° F. |
|          | 31 | 82° F. |
| January  | 1  | 83° F. |
|          | 2  | 80° F. |
|          | 3  | 70° F. |
|          | 4  | 78° F. |
|          | 5  | 61° F. |
|          | 6  | 58° F. |
|          | 7  | 73° F. |
|          | 8  | 76° F. |

7. The steel deck of a ship exposed to the sun in the tropics gets too hot to walk upon unless heavy solid shoes are worn.

8. The S.S. Examiner arrived at the Port of Bombay on January 8, 1949, at 6:15 a. m. The port was congested and the vessel was able to secure a berth at Alexandria Pier 13 only for the purpose of discharging mail which began at 11:30 that morning. In order to reach the mail which was stored in the port strong room it was necessary to lift the drums from No. 4 port trunk through the No. 4 hatch onto the main deck. 28 of the drums were placed on the portside of the deck and the remaining 8 on the starboard side of the deck. The foreman of the stevedores, who had lifted the drums and discharged the mail, planned to put the drums back in No. 4 hatch but he was directed by the Chief Officer of the S.S. Examiner not to do so, as in a couple of days the ship was expected to be back at the dock to discharge the drums.

9. The 28 drums on the port side were placed on end in a group abreast of No. 3 hatch and the balance abreast the No. 3 hatch on the starboard side. These drums remained there placed on the open steel deck without cover for 16 days from January 8 to January 23, 1949, exposed to the sun for the major part of each day.

10. After discharging the mail, the S.S. Examiner left the berth for an anchorage to await the availability of another berth to discharge the balance of her Bombay cargo. She stayed there until the 15th of January, 1949, when she moved to an open shed pier, west side of Alexandria Pier 17, inside the basin, and commenced discharging her deck cargo, but not the drums. Here, the vessel remained until January 17, 1949, when she moved to dock No. 5, a shed pier with crane suitable for the discharge of general cargo. She was moored here, starboard side to the dock, and cargo was discharged over the starboard side onto the dock by means of shore cranes. Other cargo was transferred over the portside onto lighters by ships tackle, from there to be discharged onto the dock for removal to the warehouse. In the afternoon of January 23, 1949, 8 drums on the starboard side were discharged by shore crane and placed in No. 5 shed, Alexandria dock. The remaining 28 on the portside were transferred from the main deck of the S.S. Examiner and loaded on the lighter Della Hill secured alongside on the portside of No. 4 hatch of the S.S. Examiner for subsequent discharge onto the same dock by dock cranes and removal thereafter to the warehouse. It was necessary to discharge the cargo over the portside directly onto the lighters; men were working in No. 3 and No. 4 hatches and to lift the cargo by slings across the deck to the quay side—a distance of approximately 62 feet—would have been too dangerous a manoeuvre.

11. With the loading of the drums on top of other cargo on the Della Hill on the afternoon of January 23, 1949, the last cargo destined for Bombay aboard the S.S. Examiner was discharged. When this was completed the lighter Della Hill was moved forward from the loading hatch to a position along the port bow to await its turn to discharge onto the dock.

12. In addition to the Della Hill, there were two other lighters lying off the port bow of the vessel—the 5772 (not involved in these suits since there was no cargo aboard her) and the 5338 alongside the Della Hill. The cargo on the 5338 was damaged later when some of the burning film from the Della Hill fell on it starting fire and causing her to sink. Recovery for this cargo is sought.

13. The cargo on these two lighters remained uncovered throughout the afternoon and night of January 23, 1949. At about 2 p. m. on January 24th, some of the drums aboard the Della Hill exploded and the burning film set the lighter and cargo aflame, causing it to sink with the resultant loss of and damage to some of its cargo. The fire spread

to the cargo on barge 5338 and it also sank. It is for loss to the cargo on these two lighters that libelants seek recovery.

14. On the following day, January 25, 1949, the S.S. Examiner sailed from Bombay.

15. The papers received by the stevedores at Bombay from respondent described the contents of the 36 drums as waste film scrap.

16. The cargo landed in the lighters at Bombay was not receipted for by the owners of the lighters, or by or for the account of the consignees, but receipts were to be later issued by the Bombay Port Trust acting for the consignees after the cargo was eventually discharged from the lighters onto Alexandria Dock No. 5. As to Bombay cargo landed on the lighters, the authority of the officers of the S.S. Examiner remained unimpaired until the cargo was later discharged from the lighters into the custody of the Bombay Port Trust on Alexandria Dock No. 5.

17. During the period that the 36 drums remained on the deck of the S.S. Examiner from January 8, 1949, to January 23, 1949, and the one day following, when the 28 drums remained on the lighter Della Hill, the free air temperatures in the shade ranged between daily maximums of 90.8° F. and 84.7° F. and nightly minimums of 72.8° F. and 65.0° F. For that same period the total hours of bright sunshine, each day, were just under 10 hours, except for January 14, 1949, when the total period of bright sunshine amounted to just under one hour. There was no rainfall in Bombay during the month of January, 1949.

18. The two lighters on which libelants' cargo was lost or damaged, viz., the Della Hill (No. 6128) and No. 5338 were not owned by respondent. The Della Hill was owned by Hill, Son & Dinshaw, Ltd. of Bombay; Lighter No. 5338 was hired by Hill, Son & Dinshaw, Ltd. from its owner.

19. The personnel on the lighters were employed and paid by Hill, Son & Dinshaw, Ltd.

20. Bombay was the destination of all of the cargo on the two lighters, and the dock to which the cargo on board the two lighters was to be discharged was the same dock alongside of which the S.S. Examiner was moored.

21. The respondent had knowledge and notice of the contents of the 36 drums shipped by the Cellofilm Corporation. The respondent, on December 11, 1948 prepared a hatch tally covering the 36 drums which shows that the drums bore "yellow labels," each of the drums had in fact two "yellow labels" affixed to them when stowed on board. The respondent's Assistant Port Captain prepared the stowage plan for the S.S. Examiner and approved and supervised the stowage of the 36 drums of film under deck in the No. 4 port trunk. The U. S. Coast Guard Regulations were kept on respondent's dock and the Assistant Port Captain was familiar with them. The Second Officer of the S.S. Examiner who was charged with the duty of seeing that the drums were properly stowed on shipboard was also aware of the significance of "yellow labels" on cargo.

22. Nitrocellulose, such as is found in nitrocellulose film, is subject to decomposition in the presence of heat, the rate of decomposition increasing 3.45 times for every 10° F. increase in temperature. During the course of decomposition, gases are given off in the form of oxide of nitrogen and the reaction which creates these gases is an exothermic reaction, which gives off heat itself. The decomposition reaction itself also tends to increase the temperature in any container in which the nitrocellulose film might be by reason of what is known as an exothermic decomposition reaction.

23. Whether the motion picture film is "scrap", "waste" or "old and worn out", the Coast Guard Regulations contain the warning that it is (a) highly inflammable; (b) that decomposition may start and ignition occur at relatively low temperatures; and (c) that it should be provided cool storage in a com-

partment having a temperature of not exceeding 100° F., and well away from any source of heat (pp. N–192, 193, N–209).

24. As decomposition is a progressive action which begins to have an appreciable effect upon exposure of the drums of film to higher temperatures, the stowage of the drums in the No. 4 trunk hatch, under the steel deck plates, which were exposed from time to time to the rays of the sun on a tropical voyage, generated a progressive reaction of decomposition in the film.

25. In stowing the shipment of 36 drums of scrap film in the unventilated No. 4 trunk, respondent failed to comply with the Coast Guard Regulations which required respondent to stow the drums "on deck protected" and "well away from all sources of heat", and failed to exercise due diligence.

26. No. 4 port trunk was an improper place to stow the 36 drums, because it had no direct ventilation and was partially covered by steel deck plates, exposed to the sun on a voyage through the tropics. Decomposition of the film set in under the conditions of stowage in the No. 4 port trunk.

27. The explosion and fire on the lighter Della Hill (No. 6128) and the communication of the fire to the adjoining lighter No. 5338, and libelants' cargo laden thereon, were due to the combination of the following circumstances: (a) the stowage of the drums under deck in the unventilated trunk hatch of the S.S. Examiner on the voyage from New York to Bombay; (b) the subsequent exposure of the drums to the sun at Bombay on the open deck of the S.S. Examiner for 16 days at free air temperatures reaching 90.8° F., and at sun temperatures as high as 150° F.; and (c) the stowage for one day, under similar conditions, in the barge Della Hill.

28. The danger of spontaneous ignition of photographic film, if exposed to heat, has been a matter of general knowledge for many years.

29. Libelants' cargo on the S.S. Examiner had not been discharged directly to the dock because of the congestion of cargo existing at that and other docks within the port. Because of this congestion and respondent's desire to have the S.S. Examiner sail without further delay, respondent arranged for the hire of the two lighters on which to store libelants' cargo until such time as space was available ashore to receive it.

30. Hill, Son & Dinshaw, Ltd. hired the lighters Della Hill and No. 5338 to Lionel Edwards & Co., respondent's Bombay agent. Lionel Edwards & Co. thereafter hired them to respondent, on the same terms as received by them from Hill, Son & Dinshaw, Ltd.

On the foregoing findings of fact, I do reach the following Conclusions of Law:

1. This Court has jurisdiction of the parties and subject matter of these suits.

2. The libellants had the legal status described in the respective libels and the libellants were the owners of the respective shipments of cargo and the owners and holders of the respective bills of lading as alleged in the libels. (Lib. Ex. 1, par. 4, 7).

3. Respondent was a common carrier by water for hire of libellants' shipments and respondent contracted to transport libellants' shipments from the Port of New York to the Port of Bombay and there deliver the same to the consignees designated in the bills of lading.

4. The provisions of the United States Fire Statute of 1851, 46 U.S.C.A. § 186, are not applicable. It is unlawful to stow or transport dangerous cargo on a vessel except in accordance with the regulations established by the U. S. Coast Guard, 46 U.S.C.A. § 170(6).

5. Respondent was chargeable with the knowledge of the dangerous characteristics of the waste film washed scrap it undertook to carry. If it did not have actual knowledge, it was under an obligation to seek it. See Anderson v. Lorentzen, 2 Cir., 1947, 160 F.2d 173, 175; Bank Line v. Porter, 4th Cir., 1928, 25 F.2d 843, 845.

6. Respondent failed to exercise due diligence to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried", as it was required to do under Sec. 3(2) of the U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(2).

7. The provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., are made applicable and govern the rights and obligations of the parties because by paragraph 1 of the bill of lading it is provided that the act:

"shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier."

8. The discharge of libellants' cargo from the S.S. Examiner into the hired lighters having been completed prior to the fire, the loss did not occur during "the period from the time when the goods are loaded on to the time when they are discharged", 46 U.S.C.A. § 1301(e) from the S.S. Examiner and, therefore, Section 1304(2) (b) of the United States Carriage of Goods by Sea Act is not applicable. (See Goodwin, Ferreira & Co. v. Lampert & Holt, Ltd., 34 Lloyd's Law Reps. 192, 194.)

Subsection (e) of Section 1 of the Carriage of Goods by Sea Act, 46 U.S. C.A. § 1301(e) provides that:

"The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."

This definition is further defined and restricted by Subsection (d) of Section 1 which states:

"The term 'ship' means any vessel used for the carriage of goods by sea."

"Discharged from the ship" in Subsection (e), Section 1 of the Carriage of Goods by Sea Act is accomplished by the act of transferring cargo from the main carrier to a chartered lighter, when that loading has been completed or while no other cargo is being loaded into the same lighter.

The lighters were used only for harbor transportation and as a means of conveniently moving the cargo from the holds of the vessel to the dock; they had been hired and were used as "Boats for receiving local cargo from overside and landing same on the wharf to facilitate the dispatch of the vessel." (Respondent's Exhibit H–6 being contract for hiring of lighters). The (28) drums of scrap film and the cargo in suit, all destined for discharge at Bombay, had been placed on these lighters and shifted forward alongside of No. 1 hatch on the outside, or portside of the vessel, until the lighters could be moved alongside of the dock as soon as a crane was free to discharge it. All the cargo destroyed or damaged had not been delivered to the consignees but remained in the custody and control of the respondent which had hired the lighters. Discharged from the ship itself, the lighters served as a floating dock or temporary floating storage place employed to facilitate the discharge of the Bombay cargo, because of inadequate dock facilities, and to enable the S.S. Examiner to depart Bombay more quickly. The loading aboard the lighters had been completed the day before the fire and explosion occurred.

9. The lighters hired by respondent on which libellants' cargo was loaded at the time of the fire were not "ships" within the purview of the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315.

It is urged by respondent that the lighters are to be regarded as "ships" within the meaning of Subsection (d) of Section 1 of the Act, 46 U.S. C.A. § 1301(d). The answer to this is that the lighters were not vessels used for carriage of goods by sea; they were used only for harbor transportation and here, particularly, only to move the cargo from alongside the vessel to the very dock at which the vessel was moored. The lighters were not vessels engaged in:

**138**

"the carriage of goods by sea to or from ports of the United States, in foreign trade". 46 U.S.C.A. § 1300.

Nor can I accept respondent's contention that the situation was "the same as would have existed had the S.S. Examiner never reached Bombay, but terminated her voyage short of Bombay and then chartered another vessel to complete the voyage and discharge the goods onto the dock in Bombay * *." The lighters were not other vessels "used for carriage of goods by sea."

■ 10. The fire exemption of the United States Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2) (b), being available to respondent only as another bill of lading provision, the exemption therein that respondent is not liable for fire unless caused by "the actual fault or privity of the carrier" is invalid, because that character of proof violates respondent's obligation under Section 2 of the Harter Act to refrain from inserting in a bill of lading any provision relieving a carrier from liability for damage to cargo resulting from any negligence. 46 U.S.C.A. §§ 190 et seq., 191.

■ As was noted in Federal Ins. Co. v. American Export Lines, D.C.S.D.N.Y. 1953, 113 F.Supp. 540, 542.

"The Carriage of Goods by Sea Act does not apply of its own force to cargo after it has left the ship's tackle."

The court there termed that period after the cargo had been discharged from the ship and was on the lighter as the "non-possessive custody period", 113 F. Supp. at page 542, and concluded that under a bill of lading identical to that in the instant suit "the Carriage of Goods by Sea Act does not apply to the period when cargo is on a lighter." 113 F.Supp. at page 543. Grosse Millard v. Canadian Gov't Merchant Marine (1927) 2 K.B. 432, 434.

11. When libellants' goods were put into the lighters at Bombay the sea transit was over and the whole transit was over which was made the subject of the Carriage of Goods by Sea Act. (Goodwin, Ferreira & Co. v. Lampert & Holt, Ltd., supra, at p. 194; Scrutten on Charter Parties and Bills of Lading, p. 455; Thompson's, Outline of the Law Relating to Bills of Lading, p. 57).

In Mackey v. United States (The Yoro), D.C.S.D.N.Y.1948, 83 F.Supp. 14, the trial court had held that the damaged cargo was in the ship's custody and control but that since the damage to the cargo had occurred "before the goods had reached the ship's tackles, the provisions of the U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. are not applicable proprio vigore." 83 F.Supp. 18. The trial court further held that "The provisions of the Carriage of Goods by Sea Act are made applicable and control the relations of the parties by virtue of Clause I of respondent's bill of lading * *", at page 19 which was identical in wording to a like clause in the bills of lading issued on the cargo in suit. It concluded that since the cargo was damaged while in respondent's custody and control the provision in the Bill of Lading was "invalid as an attempt to accomplish by indirection what the provisions of the Carriage of Goods by Sea Act and the Harter Act have forbidden", that is, excuse respondent from liability for the cargo loss which occurred by reason of respondent's negligence.

It is important to note that the trial court concluded the cargo was in the ship's custody because of the factual findings it had made, which were supported by evidence specifically considered by the Court of Appeals and held sufficient to support the conclusion reached, 2 Cir., 1951, 197 F.2d 241.

In the instant case, it too is not in dispute that the damaged cargo was in the ship's custody and "Yoro" lends support to libellants' contention that the provisions of the Carriage of Goods by Sea Act are not applicable since the cargo had left the ship's tackles and

rested on the lighters. As I read "Yoro" I find in it no basis for respondent's contention that it supports the application of the Carriage of Goods by Sea Act to a period other than when the goods themselves were aboard the main carrier.

The term "discharged" in Section 1(e) of the Carriage of Goods by Sea Act means that time when libellants' cargo was put into the lighters from the S.S. Examiner. Under Section 1(e) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1301(e) which provides:

"The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship".

the term "discharged from the ship" means the ship on which libellants' goods were carried in actual sea transit which was the S.S. Examiner.

12. Libellants are entitled to an interlocutory decree. A decree may be submitted on notice.

### On Motion to Reopen Trial.

Respondent prior to entry of decrees in Admiralty Causes [Inter Union Traders, Ltd. v. American Export Lines, Inc.], No. 163–352 [Reinhart v. American Export Lines, Inc.], No. 163–346 and [Kothari v. American Export Lines, Inc.], No. 164–118 moves to reopen the trial to permit amendment of its answer in order to plead as a separate partial defense that the real parties in interest, as subrogees of libelants after payment of loss, are certain marine underwriters, members of the New York Board of Underwriters, and that by virtue of the principle of law applied in three recent Supreme Court decisions, such parties are estopped from recovering against respondent. Citing United States v. Nielson, 75 S.Ct. 654; Bisso v. Inland Waterways Corp., 75 S.Ct. 629; Boston Metals Co. v. The S. S. Winding Gulf, 75 S.Ct. 649. Motions made in [Fairdeal Corp., Ltd. v. The Examiner], Nos. Ad. 163–273 and [Omni Export Corp. v. The Examiner], A. 164–62 have been withdrawn, it appearing that in these suits the underwriters were not members of the Board of Underwriters.

Respondent has been held liable for loss of cargo resulting from improper and negligent stowage. Evidence on trial showed that Captain Raven, a surveyor of the Board of Underwriters, had approved the stowage of the cargo and issued a certificate bearing the notation qualifying the approval that the Board was not "under any circumstances whatever to be held responsible * * * for any error of judgment, default or negligence of the surveyors. * * *" (R's Exs. E and E–1).

We assume for this decision that libelants, cargo owners, were insured, that they have been fully indemnified by the underwriters who in turn have become subrogated to the rights of the owners against the carrier, and that these underwriters are members of the Board and that the surveyor was negligent in approving the stowage plan; in short, assuming that respondent could establish all the matters it would allege in its proposed defense—it nevertheless is insufficient as a matter of law.

Any possible negligence which might be found on the part of the surveyor could not be imputed to either the underwriters or the cargo owners. This would be so regardless of the presence or absence of the disclaimer in the certificate. The Board was not the agent of the marine underwriters in approving the stowage. The claims sought to be enforced in these suits, assuming marine underwriters to be the real parties in interest, derive from their position as subrogees of their insured and recovery is sought as assignees in law of their insured.

The cases cited by respondent are inapposite. Respondent's motion is denied; the proposed defense would have no effect on libelants'—cargo owners or marine underwriters—right to recover for their loss. Decrees are being entered.