**MACKEY et al. v. UNITED STATES et al.**

United States District Court
S. D. New York.
Oct. 29, 1948.

Bigham, Englar, Jones & Houston, of New York City (F. Herbert Prem, of New York City, of counsel), for libelants.

John F. X. McGohey, U. S. Atty. of New York City (William H. Lane, Sp. Atty., Department of Justice, of New York City, of counsel), for respondent.

McCOLLOCH, District Judge.

### Findings of Fact

1. On March 23, 1943, various shippers at Cape Haitien, Haiti, loaded a quantity of coffee in bags on six lighters.

2. Respondent, Standard Fruit & Steamship Co., agents of the S. S. "Yoro" and of respondent, United States of America, bareboat charterer of said S. S. "Yoro," had a representative at Cape Haitien and the master of the S. S. "Yoro" dealt with that agent in relation to ship's business ashore.

3. The parties agreed at the trial that respondent, Standard Fruit & Steamship Co., was an agent for respondent, United States of America, and in the event liability is established against the carrier, the United States of America is the party liable to pay for libellants' loss, that the action be dismissed, without costs, as against respondent, Standard Fruit & Steamship Co.

4. On March 23, 1943, at about 1:30 P.M. the S. S. "Yoro" came to anchor in the harbor of Cape Haitien about one-quarter mile from shore.

5. Cape Haitien is an open port with no wharves and is exposed to northerly winds. Ships calling at that port are obliged to take on cargo in the roadstead. No tugs or motor boats are available and the practice is to send the cargo out in wooden lighters, propelled by oars or pulled by row boats.

6. The lighters were 37 feet long, 18 feet wide, and had approximately 2 feet of freeboard, after loading.

7. The lighterage from shore to vessel was arranged and paid for by the shippers.

8. There were four men on each lighter whose services were paid for by the shippers. These lightermen went out on the lighters to place the bags of coffee into the ship's slings preparatory to being hoisted to the ship's deck.

9. Four gangs of longshoremen, employed by respondent, United States of America, went aboard the vessel to await the arrival of the lighters.

10. The lighters with tarpaulins over their cargo arrived alongside the "Yoro" about one hour after she had anchored.

11. At the time the "Yoro" anchored and at the time of arrival of the lighters alongside the vessel the sea was calm, with a wind force of 2 on the Beaufort Scale, with weather overcast.

12. A supercargo, an agent of respondent, United States of America, designated the part of the ship the lighters were to tie up to.

13. The lighters were made fast to the port side of the vessel by 4 inch lines; one at the bow and one at the stern.

14. The lines were fastened to the "Yoro's" bitts by the longshoremen employed by respondent, United States of America.

15. The transfer of coffee from the lighters to the ship began at 4 P. M., the lightermen placing the bags of coffee into slings and the longshoremen hoisting them to the deck of the "Yoro" with the ship's gear.

16. There was a northerly wind blowing and the ship was headed into the wind.

17. One lighter was moored at the bow on the port side alongside of No. 1 hatch. This lighter was in the most exposed position.

18. Loading was stopped at 4:35 P. M. because of a squall which, the master testified, came up suddenly, accompanied by a strong northerly breeze having a wind force of 7 on the Beaufort Scale (40 miles an hour), with rain and a very rough sea.

19. The lighters had been secured to the ship about one hour prior to the storm and loading had been in progress 35 minutes before the storm, during the course of which cargo had been transferred from each of the lighters to the "Yoro" by ship's gear operated by longshoremen in the employ of respondent, United States of America.

20. The wind and sea caused the lighters to take heavy spray over their sides and they started to fill up.

21. The lighter at No. 1 hatch sank at 7:15 P.M. while the master was standing by the ship's rail.

22. The storm was over at 7:15 P.M. on March 23, 1943. Throughout the period of the storm of two hours and forty minutes, the master saw the lighter at No. 1 hatch, as well as the other lighters, taking water over their sides.

23. Each lighter was equipped with a hand pump which was sufficient only to control rainwater and inadequate to cope with sea water coming over the lighters' sides.

24. The sole cause of the sinking of the lighter opposite No. 1 hatch was the water taken over the lighter's sides.

25. The "Yoro" had a hose on board which could have been, but was not, thrown to the lighter to help pump out the accumulation of water therein.

26. The ship's personnel took no action to protect the lighters and the cargo, other than supplying a few additional tarpaulins.

27. The storm stopped at 7:30 P.M. and loading was resumed.

28. The cargo was brought to the "Yoro's" side by shippers' lighters, pursuant to an oral freight engagement theretofore made between the shippers and the ship's agent at Cape Haitien. Some of the wet coffee on the lighters was rejected by the vessel and other coffee, not so heavily wetted was taken aboard.

29. Boat notes, which were prepared by respondent's shore agents prior to the arrival of the lighters alongside the "Yoro", were issued by respondent to the lightermen, after the receipt of the cargo on board the "Yoro."

30. Exceptions were noted on the boat notes by respondent showing the quantity and condition of cargo when received on the deck of the "Yoro."

31. Bills of lading were thereafter issued bearing the following exceptions:

B/L # 1, dated March 25, 1943, covering 800 bags,
"208 bags soaked by sea water, refused on board; 75 bags wet by sea water"

B/L #2, dated March 25, 1943, covering 500 bags,
"75 bags soaked by sea water, refused on board; 25% of the quantity wet by sea water"

B/L #3, dated March 25, 1943, covering 250 bags,
"2 bags soaked by sea water, refused on board; 25% of the quantity wet by sea water"

B/L #4, dated March 23, 1943, covering 200 bags,
"25% of the quantity wet by sea water"

B/L #5, dated March 23 ,1943, covering 200 bags,
"16 of the bags lost in lighter No. 7"

B/L #6, dated March 23, 1943, covering 100 bags,
"65 bags not shipped; sunk alongside the ship in lighter No. 7"

32. A quantity of libellants' coffee was lost overboard upon the capsizing of the lighter and a further quantity of libellants' coffee, on the five remaining lighters, became wet after the lighters were moored alongside the "Yoro" and during the period of the storm described by the master of the "Yoro".

33. Sixty-five bags of coffee, part of the cargo covered by B/L #6 loaded on lighter No. 7, which was moored on the port side of the "Yoro" alongside of No. 1 hatch, was lost upon the capsizing of said lighter.

34. The distance from the decks of the lighters to the "Yoro's" deck was from 20 to 22 feet, so that the lighters' lines and the control of the movement of the lighters remained with the respondent's servants, the longshoremen.

35. It would have been extremely hazardous for the lighters to have left the "Yoro" in an attempt to reach shore during the storm, with the use of oars, there being no motor craft in the port.

36. The master of the "Yoro" was in control of the situation and, under the weather and sea conditions prevailing, the lighters could not safely leave the "Yoro." The "Yoro" was the only agency in position to render help.

37. The barometer readings of the "Yoro" do not support the master's assertion as to the suddenness and intensity of the storm. A ship would have barometrical indication of the approach of a storm with a wind force of 40 miles an hour (force 7 on the Beaufort Scale) of at least two or three hours before the event.

38. The only attempt made to save the lighters was by the men on the lighters through the use of hand pumps, which were a part of the lighters' equipment. Those pumps were intended for use in keeping rain water out of the lighters and were inadequate to control the quantity of water which came over the lighters' sides.

39. A reasonably prudent master would have dropped the lighters astern of the "Yoro" and pumped fuel oil from the stern of the ship to quiet the waves.

40. The operation of moving the lighters astern could have been accomplished by carrying the lighter lines along the side

of the ship and making them fast aft, the first lighter to be moved to a position 100 to 150 feet astern, so as to be completely clear, and the remaining lighters secured in line, bow to stern, as close as possible.

41. The dropping of the lighters astern would be a very simple operation in bad weather. It is the usual procedure and standard cargo practice in ports of the character of Cape Haitien.

42. The "Yoro's" length was 309' 3", beam 39' 2", depth 16' 6", gross tonnage 1697 tons, net tonnage 152 tons.

43. The "Yoro" formed a lee of approximately her own length of 309 feet. Each lighter also would give protection to the lighter astern.

44. As the "Yoro" was 309 feet in length there would be full leeway to protect the lighters and their cargo.

45. The mooring of the lighters astern would effectively have kept the water from coming over their sides, and the use of fuel oil would have provided further protection to the lighters and their cargo.

46. Libellants are entitled to an interlocutory decree against respondent, United States of America, for the amount of the damages suffered by their cargo while the lighters were alongside of the S. S. "Yoro."

### Conclusions of Law

1. Libellants were copartners and, at all material times, the owners of the cargo described in the libel.

2. Respondent was at all material times a common carrier.

3. Libellants' cargo had been delivered to, and was in respondent's actual custody and control at the time of the loss and damage.

4. There can be a delivery to a carrier while the goods remain in the vehicle of the party tendering the goods.

5. Actual physical possession of libellants' cargo at the time of the loss and damage is not a prerequisite to establishing respondent's liability for libellants' loss.

6. The taking of a receipt for cargo is not essential to complete delivery of cargo to a carrier.

7. A contract of carriage arises by implication of law upon delivery of goods to a carrier for transportation.

8. No particular form of agreement is required for a contract of a common carrier to transport goods; it may be oral or it may be written.

9. The shippers became entitled to bills of lading at the time the lighters were secured alongside the "Yoro" and loading operations commenced, and the bills of lading are presumed to be issued and dated as of that time free of the notations written on the face thereof concerning the loss and damage which occurred while the lighters were secured to the "Yoro" and in the custody and control of respondent.

10. The issuance of a bill of lading is not necessary to the creation of the status of a common carrier.

11. Respondent has failed to establish that the loss and damage was due to a peril of the sea, or other cause for which it is not liable.

12. Respondent did not properly and carefully load, handle, keep, and care for libellants' cargo while in the lighters after they were secured alongside the "Yoro," in respondent's custody and control.

13. Respondent failed to exercise due diligence in the handling and care of libellants' cargo while in the lighters secured alongside the "Yoro," in respondent's custody and control.

14. Respondent, having failed to exercise due diligence while libellants' cargo was in its custody and control, is liable, though a peril of the sea might also be a contributing cause of the loss and damage.

15. Libellants' cargo having been damaged on the lighters, while secured alongside the S. S. "Yoro" but before the goods had reached the ship's tackles, the provisions of the U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., are not applicable proprio vigore. The

provisions of the Carriage of Goods by Sea Act are made applicable and control the relations of the parties by virtue of Clause I of respondent's bill of lading which provides that that Act "shall govern before the goods are loaded on and after they are discharged from the ship, and throughout the entire time the goods are in the custody of the carrier."

■ 16. The relations of the parties in respect of liability for the loss and damage to the goods occurring on the lighters after they were secured to the S. S. "Yoro," are governed also by the provisions of Sections 1 and 2 of the Harter Act, 46 U.S.C.A. §§ 190, 191.

. [10] 17. Respondent's inaction in taking no steps to protect the lighters against water coming over their sides, (1) by moving the lighters to less exposed positions astern of the S. S. "Yoro" and by spreading fuel oil over the water while they were so moored, and (2) by providing the ship's hose to pump the water out of the lighters while moored alongside the S. S. "Yoro," was failure to exercise the degree of care required of respondent under the provisions of the Carriage of Goods by Sea Act and of the Harter Act.

■ 18. Clause I of the bills of lading provides also that

"The carrier shall not be liable in any capacity whatsoever for * * * any loss or damage to the goods occurring while the goods are not in the actual custody of the carrier."

Libellants' goods were in the "actual custody" of the respondent at the time of the loss and damage. "Actual custody" does not require that the goods be on the ship's deck or in her slings.

19. Clause I of the bills of lading quoted above, does not relieve respondent from liability for the loss and damage to libellants' goods occurring by reason of its negligence after the lighters were secured to the "Yoro" and some portion of the cargo of each lighter had been hoisted to the deck of the "Yoro."

■ 20. If said Clause I of the bill of lading purports to relieve respondent of such liability, it is invalid as an attempt to accomplish by indirection what the provisions of the Carriage of Goods by Sea Act and the Harter Act have forbidden.

21. It having been established that libellants' goods were damaged while in respondent's custody and control, the defense based upon paragraph 18 of the bills of lading, requiring the filing of notice of loss or damage, is not effective, as libellants have overcome the prima facie defense based on the failure to file such notice and have thereby met the burden imposed by Section 3 (6) of the Carriage of Goods by Sea Act.

■ 22. Provision 18 of respondent's bills of lading, requiring the filing of a written claim within thirty days of the receipt of notice of loss and damage is invalid as violative of Section 3 (6) of the Carriage of Goods by Sea Act.