### UNITED STATES v. THE SOUTH STAR et al.

United States District Court
S. D. New York.
March 24, 1953.

Myles J. Lane, U. S. Atty. (Edward L. Smith, Walter L. Hopkins and William H. Postner, New York City, N. Y., of counsel), for libelant.

Thacher, Proffitt, Prizer & Crawley, New York City, N. Y., John C. Crawley, New York City, N. Y., for respondent.

LEIBELL, District Judge.

On November 13, 1950, the United States filed its libel herein; "in rem" against the S.S. South Star and "in personam" against the Prudential Steamship Corporation, as owner of the vessel. The libel charged that the vessel loaded a shipment of 75 Army trucks at Charleston, South Carolina, on November 10, 1948, for transportation to Mediterranean ports; that on November 27, 1948, the vessel loaded 1342 tons of codfish at St. Johns, Newfoundland, Canada, for transportation to Mediterranean ports; that the said cargo was in good order and condition when shipped; that on November 27, 1948, the vessel sailed from St. Johns, Newfoundland, with said cargo and other cargo and arrived at Boston Army Base on December 1, 1948, with a large part of libelant's cargo damaged, to the extent of $65,000.

The vessel met storms a few hours after leaving St. Johns, the cargo broke loose in the hold and the vessel was forced to put into the port of Boston. It appears from the stipulation of facts, dated February 27, 1953, that the sound portion of the cargo was later delivered at the various Mediterranean ports between January 3, 1949 and January 17, 1949, so that "all of the cargo referred to in the libel, whether damaged or sound upon outturn, was discharged from the S. S. South Star and delivered prior to January 18, 1949".

Prudential filed exceptive allegations to the libel which came on before Judge Clancy in March 1951. The exceptive allegations were based upon the provisions of Article 15(a) of the charter contract between Prudential, as owner of the vessel and the United States, as charterer of cargo space on the vessel. A copy of the "contract for charter of space on cargo vessels" is annexed to respondent's exceptive allegations. Article 15 (a) provides:

"(a) The owner and the vessel in all matters arising under this charter party shall be entitled to the privileges and rights and immunities as are contained in Section 3 (6), Section 4 (except subsection (4) thereof) and Section 11 of the Carriage of Goods by Sea Act of the United States approved April 16, 1936. The aforesaid provisions (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the vessel and throughout the entire time the goods are in the custody of the owner or vessel."[1]

Section 3(6) of the Act provides:

"(6) Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence

---

[1] Sections 4 and 11 of the Act are not pertinent to the question presented by the exceptions and the motion to dismiss the libel.

of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

"Said notice of loss or damage may be endorsed upon the receipt for the goods given by the person taking delivery thereof.

"The notice in writing need not be given if the state of the goods has at the time of their receipt been the subject of joint survey or inspection.

"In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: *Provided,* That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.

"In the case of any actual or apprehended loss or damage the carrier and the receiver shall give all reasonable facilities to each other for inspecting and tallying the goods."

One of the exceptive allegations as originally filed was that "All of the cargo referred to in the libel was or should have been delivered prior to January 16, 1949". On the motion before Judge Clancy the libelant refused to admit that allegation and the judge felt obliged to deny the motion to dismiss the libel, citing United States v. Gydnia American Shipping Lines, D.C., 57 F.Supp. 369.

The parties have recently entered into a stipulation, dated February 27, 1953, which provides that for the purposes of this suit certain facts are admitted, including delivery of the sound portion of the cargo to the designated ports prior to January 18, 1949. This suit was not commenced until almost a year and eight months after the date of the last delivery.

The respondent has made a new motion, based on the exceptive allegations and the stipulation of facts, and asks that the libel be dismissed because the suit was not brought "within one year after delivery of the goods or the date when the goods should have been delivered". If the one year limitation as to suit, as provided in Section 3(6) of the Carriage of Goods by Sea Act, T. 46 U.S.C.A. § 1303(6), applies to this suit, the motion must be granted.

The government's attorney argues that the sole effect of Article 15(a) of the charter party was to incorporate into the charter party those privileges and immunities which the owner and the vessel would enjoy under Section 3(6) of the Act in a suit brought by the United States "in which the Carriage of Goods by Sea Act would apply of its own force alone", and that if the government brought such a suit the one year suit limitation provision of Section 3(6) would not apply.

Section 3(6) relates to two limitations. One is a time limitation for the filing of a notice of loss or damage and the statute declares that the failure to do so shall constitute prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. It thus prescribes a rule of proof in any suit by the shipper. The other limitation affects the liability of the shipper in respect of the loss or damage, and the statute provides that the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered. It is a time limitation on the right to bring an action for the loss or damage.

The government prepared this contract or charter party. The charter party is on a government form, Space Charter Form, Rev. 10 Sept. 1948. It is "Contract No. W30–222 to –1229". It is headed "Department of the Army, New York Port of Embarkation" and it

contains the statement, "This contract is authorized by the Armed Services Procurement Act of 1947 [41 U.S.C.A. § 151 et seq.] (Public Law 413—80th Congress) and is entered into by negotiation pursuant to Section 2(c)(10) of said Act, ASPR 3–210.2, and JPR 4–111." The opening paragraph reads:

"This charter party entered into this 24th day of September 1948 between Prudential Steamship Corporation, a corporation organized and existing under the laws of the State of New York (hereinafter sometimes called the 'owner' and sometimes called the 'contractor') and the United States of America (hereinafter sometimes called the 'charterer' and sometimes called the 'Government'), represented by the Contracting Officer executing this charter-party, witnesseth that the parties hereto do mutually agree as follows:"

Finally, the charter party was executed for the United States of America by H. Zinnel, Lt. Colonel.

The contract in this case is described as a "Charter of Space in Cargo Vessels between East Coast U.S.A. Ports and Mediterranean Range". Under Article I the owner represented that it had "established berth services operating United States flag vessels in regular trade routes between the East Coast ports of the United States and Ports in the Mediterranean maintaining regular scheduled sailings", and that "The term 'berth service' as used in this paragraph, refers to regularly advertised, common carrier services"; and that "In connection with the operation of such service the owner shall carry cargoes for the charterer in accordance with the terms of the charter party".

The contract further provided that at monthly intervals the owner and the charterer would develop programs for the transportation of government owned or controlled cargoes, during specified months, between the specified points, and that firm written commitments with respect to each voyage would be signed at least fifteen days prior to the scheduled sailing date for each voyage.

Article 14 of the Charter provides:

"Article 14, *Cargo Receipt.*

"(a) The Master shall sign a manifest or receipt acknowledging receipt of the cargo in apparent good order and condition, or noting specific exceptions thereto.

"(b) Any receipt or bill of lading signed by or on behalf of the Master or Agent shall be without prejudice to the terms, conditions and exceptions of this charter and subject to all of them. The charterer hereby agrees to indemnify and hold harmless the owner, the Master, and the vessel of and from all consequences or liabilities that may arise from the charterer or its agents or the Master signing or issuing receipts, bills of lading or other documents inconsistent with this charter or from any irregularity in the papers supplied by the charterer or its agents' orders."

Thus the government's goods were to be carried by the owner of the vessel operating as a common carrier, and any receipt or bill of lading issued by the Master was to be subject to all of the terms and conditions and exceptions of the charter. That would indicate two things; one that the Master could issue a bill of lading instead of a receipt; and, further, that any bill of lading he might issue would be subject to the terms and provisions of the charter party, including Section 3(6) of the Act.

There is no "public policy" which is opposed to the inclusion of the time limitation of Section 3(6) of the Act in a bill of lading covering a shipment of government property. Time limitations of one year, in railroad bills of lading, have been enforced against the government as a plaintiff in the following cases: United States v. Seaboard Air Line Ry. Co., 4 Cir., 22 F.2d 113 and United States v. Chicago, R. I. & P. R. Co., 5 Cir., 200 F.2d 263.

The government's brief argues that Section 3(6) of the Act does not apply

**106**

because there was no contractual limitation on the government's time to sue, and specifically asserts:

(a) that the charter party does not itself expressly contain any contractual time limitation applicable to the government's suit herein;

(b) that the time limitation of Section 3(6) of the Act is not expressly incorporated in the space charter by reference;

(c) that the Carriage of Goods by Sea Act does not apply to the United States as a shipper;

(d) that the Carriage of Goods by Sea Act does not apply to contracts of private carriage, such as a voyage charter party, but only to a commercial bill of lading;

(e) that the provisions of Section 3 (6) of the Act do not apply to the codfish cargo which was to be transported from St. Johns, Newfoundland, to two ports in Greece;

(f) that there is no proof that the government agent executing the contract had the power to waive the government's immunity from a statute of limitations on its right to sue, or that the Congress has conferred on him any such power.

As to contentions (a) and (b), it suffices that Article XV(a) of the charter party incorporates the provisions of Section 3(6) of the Act by a specific reference thereto and by a clear and explicit declaration that the owner of the vessel "in all matters" arising under the charter party "shall be entitled to the privileges, rights and immunities as are contained in Section 3(6)" of the Act and that those provisions "shall govern".

Contentions (c) and (d) are not pertinent because assuming their correctness, nevertheless the parties to the contract of carriage could and did, by a clear declaration to that effect, incorporate therein various provisions of the Act and make them part of the contract. The Act itself does not forbid any such practice and there is nothing inherently wrong in doing so.

As to contention (e), although the Carriage of Goods by Sea Act would not by its terms (§ 1) apply to that part of the cargo (the codfish) transported from a port outside the United States (in Newfoundland) to another foreign port (in Greece), the parties to the contract have themselves by an amendment of February 10, 1949, made that particular cargo a part of the contract of September 24, 1948, and have thus made applicable to that shipment the provisions of Article XV(a) of said contract. There is nothing to the assumption that the purpose of XV(a) was to make it apply to the Newfoundland shipment of codfish. Clause XV(a) was in the contract when it was originally signed, September 24, 1948, and at that time the "Description of Services" set forth in Article I of the charter party referred to the carriage of cargoes for the charterer between "East Coast Ports of the United States and Ports in the Mediterranean". Amendment B was added by a supplemental agreement of February 10, 1949 (after the loss) and was made retroactive to November 1, 1948 and specifically covered "the carriage of cargo between the port of St. Johns, Newfoundland, and ports in the Mediterranean".

■ As to contention (f), the contract itself, on a government form, declares that it is authorized and was entered into pursuant to certain specified laws of Congress. Nothing to the contrary has been shown in any part of the government's brief. If it contained any ambiguities they would have to be construed most favorably for the other contracting party and that party would have the right to assume that a specific provision in the charter party actually meant what it appears to state.

■ The respondent, Prudential Steamship Corporation, impleaded James W. Elwell & Co., Inc., the agent of respondent, and Charleston Stevedoring Company, the company that loaded the trucks aboard the vessel at Charleston. The respondents impleaded have an in-

terest in the motion of the respondent to dismiss the libel. In A. M. Collins & Co. v. Panama R. Co., 5 Cir., 197 F.2d 893, 896, the stevedore claimed the benefit of the provision of Section 4(5) of the Carriage of Goods by Sea Act which limits the amount recoverable "per package" to $500. The provisions of the Act had been included in the bill of lading issued by the carrier. The carrier engaged the Panama Railroad Co. as stevedore to unload the shipment for the carrier at Cristobal. The court held:

> "A stevedore so unloading, in every practical sense, does so by virtue of the bill of lading and, though not strictly speaking a party thereto, is, while liable as an agent for its own negligence, at the same time entitled to claim the limitation of liability provided by the bill of lading to the furtherance of the terms of which its operations are directed.
>
> \* \* \* \* \* \*
>
> "The limitation on liability of the carrier under the Carriage of Goods by Sea Act is not intended to be personal, but, unless otherwise agreed, extends to any agency by means of which the carrier performs its contract of transportation and delivery."

There is also a dictum, by L. Hand (concurring) in L. W. & P. Armstrong, Inc. v. The Mormacmar, 2 Cir., 196 F.2d 752, 755, which supports the same principle. He states: "Since the suit against the United States was therefore brought too late [§ 1303(6), T. 46 U.S.C.A.] it is not necessary to decide whether the libellant suffered any loss. It was right to dismiss the claim against Moore-McCormack Lines, Inc. [the general agent of the United States] for another reason as well. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692." The words "as well" in the above quotation indicate that the judge considered the general agent of the carrier entitled to the benefit of Section 1303(6) which had enured to the benefit of the carrier, the United States of America, as owner of the vessel Mormacmar.

■ For the reasons above stated the action should be dismissed against the two respondents impleaded herein, James W. Elwell & Co., Inc., and Charleston Stevedoring Company.

■ The exceptions to the libel are sustained and the libel is dismissed on the grounds that this action against the owner, the Prudential Steamship Corporation, and against the steamship South Star was not timely brought and is barred by the one year limitation of Section 3(6) of the Carriage of Goods by Sea Act.