**KRAWILL MACHINERY CORPORATION, a Michigan corporation, Kraus Manufacturing Corporation, a Michigan corporation, Engineering Industries International, S.A., a corporation,**

v.

**ROBERT C. HERD & COMPANY, Inc., a Maryland corporation, Bethlehem Steel Company, a Delaware corporation.**

No. 8117.

United States District Court
D. Maryland, Civil Division.

Oct. 24, 1956.

Ober, Williams, Grimes & Stinson, Baltimore, Md., Fildew, DeGree, Fleming & Gilbride, Detroit, Mich. (William A. Grimes, Baltimore, Md., Leslie W. Fleming, Detroit, Mich., of counsel), for plaintiffs.

Lord, Whip & Coughlan, Baltimore, Md. (George W. P. Whip and Robert E. Coughlan, Jr., Baltimore, Md., of counsel), for Robert C. Herd & Co., Inc.

Semmes, Bowen & Semmes, Baltimore, Md. (William D. Macmillan and William A. Fisher, Jr., Baltimore, Md., of counsel), for Bethlehem Steel Co.

THOMSEN, Chief Judge.

This is a suit by a shipper against a stevedore and the owner of a floating crane to recover for damage to a heavy press sustained when the case in which it was enclosed fell into Baltimore harbor while it was being loaded from a railroad car onto a ship. The issues are: (I) which defendant was negligent;

(II) whether, as defendants contend, either (A) the contract between the plaintiff shippers and the carrier, or (B) the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., commonly called Cogsa, limits the liability of either or both defendants in this suit to $500; and, if not, (III) the amount of the damages.[1] Plaintiffs contend (A) that there was no contract between the shipper and the carrier which extended any such limitation of liability to either defendant, and (B) that Cogsa does not apply so to limit their liability (1) because no bill of lading covering the press was ever issued, (2) because the damage did not occur within the period "from the time the goods are loaded on to the time when they are discharged from the ship", 46 U.S.C.A. § 1301(e), and (3) because neither defendant is a "carrier" or a "ship", and is therefore not entitled to the benefit of the Act.

## Findings of Fact.

Plaintiffs, in fulfillment of a contract with a Spanish company, Comercio, Industria y Transportes, S. A., shipped various items of machinery and equipment from Detroit to Spain via Baltimore. Plaintiff, Krawill Machinery Corporation (Krawill), has succeeded to the rights of the other plaintiffs.

The shipment consisted of 62 cases, which moved by rail and truck from Detroit to Baltimore, where they were to be loaded onto the S. S. Castillo Ampudia for carriage to Valencia, Spain. One case, which contained a large press, weighed 19 tons.

John H. Faunce, Inc. (Faunce), freight forwarders who handled Krawill's shipment, prepared all bills of lading involved in the shipment and delivered them to Garcia & Diaz, Inc. (Garcia), general agents in New York for the owner of the S. S. Castillo Ampudia, for signature. The bills of lading were on the printed forms of Compania Transatlantica Espanola, S. A., Garcia & Diaz, Inc., agents.

After each original bill of lading had been signed by the carrier's Baltimore agent, the original and several copies were delivered in New York by Garcia to Faunce. Faunce in turn delivered the original bill of lading and copies to Graul, a representative of Krawill.

One of the bills of lading was drawn by Faunce to cover eleven cases, including the heavy case involved in this action. After that bill of lading had been signed by the carrier's Baltimore agent, but before its delivery to Faunce, Garcia informed Faunce that one case had been dropped and that the bill of lading would be changed to read ten cases instead of eleven. When delivered by Garcia to Faunce the bill of lading had been so changed, and the figures stating "shipper's gross weight" in kilos and in pounds had been correspondingly reduced. Garcia neither asked for nor received the consent of Faunce or of any one else representing Krawill to make the change in the bill of lading, but it does not appear that any one ever made any objection to the change.

Each of the bills of lading contained, among others, the following printed provisions:

"7. The Carrier's responsibility in respect of the Goods as a Carrier shall not attach until the Goods are actually loaded for transportation upon the Vessel, and shall terminate, without notice, as soon as the Goods leave the Vessel's tackles at destination or other place where the Carrier is authorized to make delivery or end its responsibility. Any responsibility of the Carrier in respect of the Goods attaching prior to such loading or continuing after leaving the Vessel's tackles as aforesaid, whether the Goods are in course of lighterage by the Carrier or however else the same may be situated, shall be the same only as that of a Warehouseman, without liability on the part of the Carrier, except

[1] It was agreed that evidence with respect to the amount of damages claimed by shippers should not be presented until the other issues are finally decided.

for want of ordinary care; and all conditions, exemptions, exceptions and limitations of the liability of the Carrier, contained in this contract shall be deemed to apply also to such Warehouseman's Liability as well as to liability as a Carrier. * * *

"30. In consideration of a choice of freight rates having been offered to the shipper by the Carrier, it is agreed that in case of loss of, or damage to '* * * goods of an actual value exceeding $500 ,* * * per package or, in case of goods not shipped in packages, per customary freight unit, the value of such goods, shall be deemed to be $500 per package or per said unit and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per said unit and pro rata in case of partial loss or damage, unless the nature of such goods and a value higher than $500 per package or per said unit shall have been declared in writing by the shipper upon delivery to the Carrier and noted on the face hereof and unless payment of the extra freight charge incident thereto shall have been made or promised * * *, in which case such declared value, or the actual value if less, shall be the basis for computing damages and any partial loss or damage shall be adjusted pro rata. * * *

"37. This bill of lading shall have effect subject to the Carriage of Goods by Sea Act of the U. S. A. and the carrier and the ship shall be entitled to all of the rights and immunities set forth in said Act. To the extent that any term of this bill of lading is repugnant to or inconsistent with anything in such Act, it shall be void."

Robert C. Herd & Co., Inc. (Herd), the stevedore, had no written contract with Garcia or with the owner of the ship. Herd has been doing business with Garcia for many years, but never on the basis of a written contract. In the course of their dealings there had been no suggestion that Herd's charges for stevedoring should vary with any declared value of the cargo. Herd's charges are not based on any declared value, but are in accordance with its usual tariff, which provides different rates for different commodities. Such rates are predicated upon weight, density, difficulty of handling and other factors affecting the cost of doing the stevedoring work. This is in accordance with the custom in the port of Baltimore.

The case enclosing the heavy press and other equipment was 8 feet wide, 5 feet long, and 11 feet high. It was loaded onto a flat car, with the press bottom end up. The case rested on two wooden skids, 4 x 4's, 8 ft. long, to which it was bolted. The skid ran across the car. The railroad company carried the case onto the Canton Railroad Pier, on a track which ran about 4 ft. from the side of the pier to which the S. S. Castillo Ampudia was moored, and released the case to Herd. Herd's operating manager realized that the case was too heavy for the ship's gear, and arranged with Bethlehem Steel Company to have a floating derrick, owned by Bethlehem and operated by its employees, come alongside the ship to assist in loading the case.

The derrick arrived about 1 p. m. on April 14, 1954, the day of the accident, and tied up on the offshore side of the ship opposite the No. 2 hold, into which the case was to be loaded. The crane operator was told that the case was not to be loaded until about 2 p. m., so he left the barge which carried the crane, went onto the deck of the ship, and looked at the case. He then returned to his barge and swung the boom of the crane over the ship so that the hook and the gear were over the flat car.

The floor of the operator's control room was about level with the main (weather) deck of the ship; the crane operator could not see the flat car or the crate from where he stood to operate the crane, and it was necessary for Herd's deckman to relay to the crane operator the sig-

558

nals he received from Herd's gang carrier on the pier.

Herd's operating manager was on the pier, but did not concern himself with the loading of the case after the floating derrick had been ordered. A gang carrier, Wilkerson, who had worked for Herd for twenty years, was in charge of the loading operation. Of his gang of fifteen men, four were on the pier with him, one was on the deck, and the rest were in the hold.

Wilkerson found that he could not get the regular wire sling under the crate on the flat car because the wire was too thick. He therefore decided to work a thinner wire under the shore end of the skids, attach this thinner wire to the hook of the crane, and have the crane lift or tilt the case sufficiently high for him to slide the regular sling under the skids, or to place one or more chocks under the skids so that the regular sling could be placed around the case.

Such an operation is not unusual when stevedores are loading heavy machinery with the aid of a derrick. The crane operator knew that the first lift he would be called upon to make would be a relatively short one, but he did not know and was not told how short it was to be.

Wilkerson, the gang leader and responsible representative of Herd at the time, did not realize the peculiar difficulties of this particular job. Those difficulties were occasioned by two facts, which were or should have been known to him: first, that the case stood on the flat car with its largest dimension its height, and did not lie on its side, with its largest dimension on the floor of the car, as is customary; second, that the press was upside down in the case, with the heavy bottom portion of the press in the air. Each of these factors made it top heavy, and since Wilkerson planned that the preliminary lift would give the case a tilt toward the ship, there was far more than the usual danger that the case would be tilted to the point where its center of gravity would shift and cause it to fall toward the ship.

This situation called for unusual care on the part of the gang leader, to see that the case was not lifted too high. He testified that he intended a lift of only 2 to 4 inches, but he did not tell this to the crane operator. The experienced crane operator knew that a short preliminary lift was probable, but he did not know how short it was to be, nor how unusually ticklish the situation was. The gang carrier gave the customary continuing hand signals to the deckman, and the deckman relayed them to the crane operator. Neither the deckman nor the crane operator was young, and the normal reaction time for each was at least 3⁄4 of a second. The boom of the crane had to rise long enough to take up the slack in the wire, to grip the case, and to raise it the required distance. It was necessary for the gang carrier to give the signal to stop lifting with more than the usual promptness, because he knew or should have known that the crane would continue to lift for at least 1½ to 2 seconds after he gave his signal.

The operation could have been more safely performed with a jack, such as Bethlehem uses in similar operations. Stevedores do not customarily use jacks for this type of operation, nor do they customarily take special precautions to keep the load from going off balance. The operation was conducted in the usual way, but without recognition by the gang carrier of the unusual dangers and without his taking any adequate steps to prevent the accident. I find Herd negligent in the planning of the operation.

The deckman was not negligent in transmitting the signals, and the crane operator was not negligent in putting them into effect. If there was any unreasonable delay beyond the normal reaction time, I find that such delay was the delay of Wilkerson in not giving the "stop" signal as soon as he saw the side of the case start to rise from the floor of the flat car. The deckman testified that when he got the "stop"

signal from Wilkerson he could see the case moving, but could not say how high it was. I find that Wilkerson did not change the signal from "raise" to "stop" as soon as the case started to tilt, but waited too long, because of his failure to make allowance for the normal reaction time of the deckman and the crane operator.

Conclusions of Law and Discussion.

I. The damage was caused by negligence on the part of Herd and not by any negligence on the part of Bethlehem.

II. The general rule is that a person is liable for all pecuniary damages proximately caused by any negligence with which he is chargeable. Any limitation of such liability must be based upon some contract, statute, or rule of law, of which he is entitled to claim the benefit.

In the case at bar Herd had no contract with the plaintiff shippers. Its contract with the carrier, made through the carrier's agent, Garcia, contained no provision limiting Herd's liability. Herd's charges to the carrier would have been the same whether the agreement between the plaintiff shippers and the carrier had expressly limited to $500 the liability of the carrier for each item handled or had provided that the carrier might be liable up to many thousands of dollars for some or all of the items. Herd can limit its liability to plaintiffs in this case only by showing that either (A) the contract between plaintiffs and the carrier, or (B) the statute, Cogsa, limits to $500 the liability of the carrier and the ship for the loss sustained by plaintiffs, and that Herd is entitled to the benefit of that contract or statute.

A. Whether the contract between the plaintiff shippers and the carrier limits to $500 the liability of the stevedore for the damage to the press requires an answer to three subsidiary questions: (1) Was there a contract between the plaintiffs and the carrier governing their respective rights and obligations with respect to the crated press at the time it was damaged? (2) Did such contract limit to $500 the liability of the carrier for damage to the press at the time the damage occurred? (3) Is the stevedore entitled to the benefit of such limitation of liability?

B. Whether Cogsa *ex proprio vigore* limits to $500 the liability of the stevedore, also depends upon the answer to three questions: (1) Does Cogsa apply unless a bill of lading covering the specific items of cargo has been issued? (2) Did the damage occur during the period "from the time the goods are loaded on to the time when they are discharged from the ship"? (3) Does Cogsa extend to a stevedore the benefit of the limitation of liability contained in sec. 1304(5), or does Cogsa govern only the respective rights and obligations of the carrier and the ship on the one hand, and the shipper on the other?

Cogsa, generally, and the situations in which it is or may be made applicable.

46 U.S.C.A. § 1312 provides that Cogsa "shall apply to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade. * * *" But sec. 1301(e), defining the term "carriage of goods" states: "The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."

The effect of this definition is that Cogsa does not apply *ex proprio vigore* to the entire period of the ordinary contract of carriage, which usually commences when the cargo is accepted by the carrier for transportation or comes within the control and custody of the officers of the ship for that purpose. Pollard v. Vinton, 105 U.S. 7, 9, 26 L.Ed. 998; Inland Waterways Corp. v. Standard Commercial T. Co., 5 Cir., 65 F.2d 715, 717; Mackey (The Yoro) v. U. S., D.C.S.D.N.Y., 83 F.Supp. 14, 18, affirmed 2 Cir., 197 F. 2d 241, 243.

Although Cogsa does not apply *ex proprio vigore* to the period before the goods are loaded on, it is frequently made applicable by contract throughout the entire time the goods are in the custody of the carrier. See e.g. Mackey (The Yoro) v. U. S., 83 F.Supp. at page 19. But there was no such provision in the contract in the instant case.

Knauth, Ocean Bills of Lading, p. 141, says that under the Hague Rules, upon which Cogsa is based, five steps must be considered in the case of a shipment such as the one involved here. "A. From the inland point to the custody of the ship's agent, who can only give a 'received for shipment' (or custody or port) bill of lading; B. the custody of the ship's agent prior to 'loading on' or hooking on the ship's tackles; C. the 'Cogsa' period on board the ship, from tackle hooked on at loading port to tackle released at discharging port with a 'shipped' (on board) bill of lading; D. the port agent's custody period at port of discharge; and E. the on-carriage thereafter."

The distinction between period B, the "before" period, and period C, the "Cogsa" period, is illustrated by the fact that 46 U.S.C.A. § 1303 provides for two types of bills of lading. Sec. 1303(3) provides: "After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things— * * *." This is a "received for shipment", "custody", or "port" bill of lading. Sec. 1303(7) provides for a "shipped" bill of lading, as follows: "After the goods are loaded the bill of lading to be issued by the carrier, master, or agent of the carrier to the shipper shall, if the shipper so demands, be a 'shipped' bill of lading * * *."

During period C, the Cogsa period, "from the time when the goods are loaded on to the time when they are discharged from the ship", the rights and immunities of the carrier and the ship are governed by sec. 1304(5), which provides a limitation of $500 per package unless a higher value has been declared by the shipper before shipment and inserted in the bill of lading.

During period B, which has been called "the non-possessive custody period", Cogsa does not apply, unless it is made applicable by the contract. Sec. 1307. Federal Insurance Co. v. American Export Line, D.C.S.D.N.Y., 113 F. Supp. 540.

1. A. *Was there a contract between the plaintiff shippers and the carrier governing their respective rights and obligations with respect to the crated press at the time it was damaged?* The findings of fact show that the shippers and the carrier intended that bills of lading should be issued covering each of the 62 crates or cases. Such bills of lading were prepared by the shippers' agent on the carrier's forms, and were signed by the carrier's agent. They were "shipped" bills of lading. Sec. 1303(7). Since the bills of lading in the instant case were "shipped" bills, and since the crated press was never loaded onto the ship, it was proper to eliminate that item from the bill of lading on which it was listed, before that bill was delivered by the ship's agent to the shippers' agent. It is not the custom in the port of Baltimore to issue dock receipts or "received for shipment" bills of lading, although the latter are sometimes issued here, and may be demanded by the shipper after the carrier has received the goods into his charge. Sec. 1303(3).

The plaintiffs and the carrier had agreed upon the terms of their contract before the crated press was dropped; those terms were embodied in the bills of lading which had been prepared, and included clause 7, clause 30 and clause 37, set out in the findings of fact. Clause 37 provided that the bill should have effect subject to Cogsa; clause 7 was a "before and after clause" covering the rights and obligations of the carrier during Periods B and D, before and after the Cogsa period.

■ The parties, therefore, were governed by the terms of their agreement as set out in the bills of lading, with respect to all of the crates, from the time the crates were delivered into the charge or custody of the carrier. "Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; * * *." Restatement of the Law, Contracts, sec. 26. See also The Dalzellite (The Sabine Sun), D.C.S.D.N.Y., 48 F.2d 598, affirmed Sun Oil Co. v. Dalzell Towing Co., 2 Cir., 55 F.2d 63, Id., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311; Mackey (The Yoro) v. U. S., D.C.S.D.N.Y., 83 F.Supp. 14, affirmed 2 Cir., 197 F.2d 241; Inland Waterways Corp. v. Standard Commercial T. Co., 5 Cir., 65 F.2d 715, at page 717.

■ 1. B. *Is Cogsa ever applicable ex proprio vigore unless a bill of lading is actually issued covering the specific items of cargo?* No American case has been cited or found passing on this question; it appears either from the opinions or the findings of fact in all of the cases that a bill of lading had in fact been issued.

In Mackey (The Yoro), supra, bills of lading were issued bearing "exceptions", in which were noted the loss of certain bags of coffee and the damage to certain other bags before they were loaded onto the ship. It was held in that case that Cogsa did not apply *ex proprio vigore* because the cargo had not reached the ship's tackle, not because the items in controversy had been eliminated from the bills of lading as issued. The "before and after" clause was held to apply to the bags which had been lost or damaged. The decision turned on the question whether the bags had come into the custody of the carrier at the time of the loss and damage. The Inland Waterways case, supra, also involved the question of custody.

Cogsa may be applicable *ex proprio vigore* even though no bill of lading has ever been actually issued. United States v. The South Star, 2 Cir., 210 F.2d 44, 45. Sec. 1303(3) provides that "after receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading". Sec. 1303(7) provides: "After the goods are loaded the bill of lading to be issued by the carrier, master, or agent of the carrier to the shipper shall, if the shipper so demands, be a 'shipped' bill of lading". If Cogsa does not apply unless a bill of lading has already been issued, those provisions would be meaningless. Carver, Carriage of Goods by Sea, 9th Ed., p. 169.

Sec. 1306 permits special agreements in regard to particular goods, not ordinary commercial shipments made in the ordinary course of trade. See also certain British cases discussed in Carver, op. cit. pp. 169, 170. But the instant case is not such a case. The shippers and the carrier did not make any such contract. The bills of lading which were prepared specifically provided that they should have effect subject to Cogsa.

2. A. *Does the contract between the plaintiffs and the carrier limit to $500 the liability of the carrier for damage to the press at the time the damage occurred?* B. *Does Cogsa, sec. 1304(5) apply to limit such liability to $500?*

The contract, as set out in the bill of lading, provides in clause 37 that it shall have effect subject to Cogsa. So, during the Cogsa period, "from the time when the goods are loaded on to the time when they are discharged from the ship", sec. 1304(5) applies to limit the liability of the carrier to $500, since no greater value was declared.

Before the Cogsa period, clauses 7 and 30 control. Clause 7 provides: "The carrier's responsibility in respect of the goods as a carrier shall not attach until the goods are actually loaded for transportation upon the vessel. * * * Any responsibility of the carrier in respect of the goods attaching prior to such loading or continuing after leaving the vessel's tackles as aforesaid, * * * shall be the same only as that of a ware-

house * * *; and all conditions, exemptions, exceptions and limitation of the liability of the carrier contained in this contract shall be deemed to apply also to such warehouseman's liability as well as to liability as a carrier." Clause 30 limits to $500 the liability of the carrier for each item.

Under these circumstances, if the suit were against the carrier, it would make no difference whether the contract or Cogsa controls. The only reason for deciding whether the damage occurred during the period controlled by Cogsa is that some judges have felt that in passing on the claim of the stevedore to be entitled to the benefit of the carrier's limitation of liability, it might make a difference whether that limitation is based on Cogsa itself, or on the contract of carriage. A. M. Collins & Co. v. Panama R. Co., 5 Cir., 197 F.2d 893, 895.

Knauth, op. cit., p. 144, states: "The Convention and Act define the terms 'Carriage of Goods' in Art. 1(e) as 'the period from the time when the goods are loaded on to the time when they are discharged from the ship.' The coverage therefore depends on physical acts at the ship's side or on her decks which can be seen and which are usually the occasion for a record, a tally and an inspection." Knauth then lists all the possible meanings which have been suggested: the time of receipt for shipment, the time when the cargo comes alongside, the moment when the loading tackle is hooked on to lift the item of cargo from pier or lighter for transfer to the ship (the "tackle to tackle" rule), the moment when the item of cargo, either suspended from tackle, or rolled on a conveyor or sliding through a pipe, actually crosses the line of the ship's rail (the "rail to rail" test), the moment when the item of cargo first comes to rest within the boundaries of the hull of the ship, on deck or in a hold, and the moment when the item of cargo finally comes to rest in the place of stowage. Knauth concludes that "loading on" should be related to some physical act of possession associated with transfer of risk from a shore interest to a ship interest, and states that the following points satisfy the requirements of the various usual situations:

"When cargo is hoisted by ship's gear and tackle, the loading on occurs when the ship's tackle is hooked onto the draft of cargo. When cargo is hoisted by a pier-side crane, or a floating derrick not controlled by the ship, the loading on occurs when the draft of cargo is first laid down at a point within the boundaries of the hull of the ship. When the cargo is rolled from the shore or lighter into the ship by a gangway, over the ship's rail or through a side door, the loading on occurs when the cargo passes over the ship's rail or through the ship's side door. When the cargo flows through a chute or a pipe, the loading occurs at the ship's end of the chute or pipe; in handling liquids, this would be at the flange where the ship's piping or hose is connected to the shore or lighter pipe or hose." (p. 144)

Most American cases have adopted the "tackle to tackle" test. Mackey (The Yoro) v. United States, supra; Federal Insurance Co. v. American Export Lines, supra; Remington Rand v. American Export Lines, D.C.S.D.N.Y., 132 F.Supp. 129. The reasons for preferring this rule are discussed by Knauth, op. cit., p. 146.

The application of the "tackle to tackle" test in the case at bar is not free from doubt. The damage did not occur while the goods were being lifted onto the ship, but during a preliminary stage of the loading operation prior to the actual lift. The goods had not been placed in a sling attached to the ship's tackle or to the tackle of the floating derrick, to be lifted onto the ship. The lift which caused the damage was a preliminary lift to enable the longshoremen to place a sling under the case. If Bethlehem had been in charge of the operation, that lift would probably have been made by a jack.

Moreover, the tackle was not the ship's tackle but the tackle of the floating derrick. Knauth, op. cit., p. 145, quoted above, makes a distinction between (a) where the cargo is hoisted by the ship's tackle and (b) where it is hoisted by a pier-side crane or a floating derrick not controlled by the ship. In the latter case, he says that "the loading on occurs when the draft of cargo is first laid down at a point within the boundaries of the hull of the ship". See also The Cordillera, Fed.Cas.No. 3,229a, C.C.S.D.N.Y., 5 Blatchf. 518.

■ It is necessary to draw the line somewhere. "The Hague Rules and the resulting Convention and legislation are shaped with respect to the ship rather than the carrier." Knauth, op. cit. p. 146. I conclude that the damage did not occur during the Cogsa period.

III. *Is the stevedore entitled to the benefit of the carrier's $500 limitation of liability either (A) under the contract, or (B) under Cogsa?* The answers to (A) and (B) are not necessarily the same, and the conflicting authorities on both aspects of the question have to be carefully considered, because in many cases the provisions of the bill of lading make Cogsa applicable as a matter of contract to contracts of carriage to which it would not apply *ex proprio vigore.*

After the passage of the Harter Act, 27 Stat. 445, 46 U.S.C.A. §§ 190–196, and before the passage of Cogsa, the Supreme Court decided Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712, 60 L.Ed. 1156. In that case the bill of lading limited the liability of the carrier to $100. A valuable automobile was lost due to the negligence of the stevedore. The court held the stevedore primarily liable for the full amount, and the carrier secondarily liable for $100 only. The stevedore did not plead, nor attempt to rely upon, the limitation of liability of the carrier, but the Supreme Court gave no indication that the stevedore might have such a right, either under the Harter Act or under the general law.

Although the Harter Act was very broadly worded, it was held generally to govern only the relations between the carrier and the ship on the one hand and the cargo owner on the other. Poor, Charter Parties and Ocean Bills of Lading, (3d Ed.) p. 129; Robinson on Admiralty, (1939 Ed.), p. 506; Green, The Harter Act, 16 Harv.L.Rev. 157, at 177. The Harter Act formed the basis for many of the Hague Rules, adopted by the Brussels Convention. When the Rules were enacted by Congress as Cogsa, it was recognized that the Act was a compromise between the desires of shippers and carriers with respect to their reciprocal rights and obligations. I have been referred to nothing in the Rules, the Convention or the debates in Congress at the time Cogsa was adopted which indicates that the rights or obligations of stevedores were considered in any way.

Nevertheless, in A. M. Collins & Co. v. Panama R. Co., 5 Cir., 197 F.2d 893, 897, certiorari denied 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 677, the majority of the court, per Rives, Circuit Judge, held that a stevedore was entitled to the $500 limitation of liability. There was a strong dissent by Circuit Judge Holmes. In the Collins case, the shipment was from a port in the United States to the Canal Zone, and the bill of lading contained an express limitation of liability to $500 per package or per customary freight unit. The majority stated that a possible difference might be claimed between an application of Cogsa *ex proprio vigore* and its application by reason of the agreement contained in the bill of lading, in that in the latter alternative the limitation of liability may not be effective as to the stevedore unless its services were engaged either expressly or impliedly subject to the same limitation of liability. The court found that the stevedore in that case was acting under the limitation of liability provision of the bill of lading, and stated that if the carrier had contracted with the stevedoring company for a limitation of liability in a larger sum or for liability without limitation, a different situation would have been presented.

There was no evidence in the Collins case similar to the evidence in the case at bar that stevedores on the Eastern Seaboard customarily base their charges upon such factors as weight, difficulty of handling, etc., and do not consider the amount of their possible liability in fixing their rates.

■ There is no evidence in the case at bar that any of the parties intended that the stevedore or the owner of the floating derrick should have the benefit of the limitation of liability provision included in the bill of lading issued by the carrier to the plaintiffs. Clause 1 of the bill of lading reads as follows: "Definitions. The term 'Carrier' used herein includes owners, vessels, masters and charterers thereof, and any substituted or continuing Carrier. The term 'Goods' and/or 'Packages' includes all property mentioned or referred to on the face of this bill of lading." The bill of lading refers throughout to the "carrier", and contains nothing to indicate that the stevedore was entitled to any limitation of liability to which the carrier was entitled. If the stevedore is to have the benefit of such limitation, it must be because of Cogsa or of some general rule of law.

The majority in the Collins case said that the limitation of liability of the carrier under the Carriage of Goods by Sea Act is not intended to be personal, but, unless otherwise agreed, extends to any agency by means of which the carrier performs its contract of transportation and delivery. The court cited 2 American Law Institute, Restatement of Agency, sec. 347: " 'An agent who is acting in pursuance of his authority has such immunities of the principal as are not personal to the principal.' " This section of the Restatement refers to immunities of the principal and not to limitation of liability. The comment following sec. 347 indicates that it is intended to apply to immunities which exist in order more adequately to protect the interests of a person in relation to his property; thus, the servant of a landowner while acting within the scope of his employment is under no greater duties to unseen trespassers than is the landowner. A contractor who cuts timber on an electric company's easement is not liable in trespass to the landowners. Ivy H. Smith Co. v. Warffemius, 201 Md. 367, 93 A.2d 764. The Maryland case discusses at length sec. 343 and sec. 345 of the Restatement, as well as sec. 347. Herzog v. Mittleman, 155 Or. 624, 65 P.2d 384, 109 A.L.R. 662, the only case cited by the majority in the Collins case on this point, is to the same effect. Although an occasional case has given the section a broader application, it should not control the problem involved in the Collins case and in the case at bar. The question here is whether (A) the shippers and the carrier in making their contract, or (B) Congress in passing Cogsa, intended the limitation of liability to be personal to the carrier and the ship or intended to extend the benefit of the limitation of liability to the stevedore. The evidence with respect to (A) was discussed in the last paragraph. In considering (B) it is important to note that the reciprocal obligations which Cogsa imposes are personal to the ship and to the carrier and do not extend to the stevedore.

The majority in the Collins case stated: "It would be unreasonable to assume that Congress intended that, in order to make the limitation of liability provided in the Carriage of Goods by Sea Act applicable to the unloading of the goods, the carrier must do its own stevedoring." This is true; but the majority overlooked the fact that the carrier and the ship are entitled to the $500 limitation of liability whether they do their own stevedoring or have it done by an independent contractor, and that it is not necessary to extend the benefit of the limitation to the independent contractor in order to give the carrier and the ship the protection to which they are entitled under the statute. In passing Cogsa Congress was thinking of the liability of the carrier and of the ship to the shipper, not the liability of the stevedore.

Judge Holmes, dissenting in the Collins case, said:

"The right of the ship or carrier to limit its liability for negligence to an amount not exceeding $500 is in derogation of the common law and must be strictly construed. It does not shield an employee, not a party to the bill of lading, who (for instance) negligently sets fire to or otherwise negligently injures the cargo. No ship, carrier, or party to the bill of lading, is being sued in this case, but only the corporate stevedore, which is primarily liable under the decision of Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712, 60 L. Ed. 1156. * * *

" * * * The appellee owed a duty to the public to keep its stevedoring equipment in a safe condition; the answer admits that it did not do so. Where an agent violates a duty that he owes to a third party, he is personally liable to the latter, not by reason of his agency, but upon the ground that he has failed in his common law obligation not to injure another. * * *

" 'The liability of an agent for his own negligence has long been embedded in the law.' Brady v. Roosevelt S. S. Co., 317 U.S. 575, 580, 63 S.Ct. 425, 428, 87 L.Ed. 471. * * *

"The bill of lading in this case limited the carrier's liability in question to $500, but it did not confer upon the carrier the power to diffuse partial dispensations to its negligent stevedores or other agents for their wrongful acts."

In The Steel Inventor, D.C.Md., 35 F.Supp. 986, 996, Judge Chesnut called attention to the difference between an action against the carrier in which the carrier brings in a lighterage company for indemnity, and a tort action against the lighterage company. Judge Chesnut said: "The libelants base their claim against the Isthmian Steamship Company on breach of contract, and it will of course have been noted that they are not directly suing the Baltimore Company in tort for negligence. If the suit had been in the last mentioned form it would seem clear enough that the larger sum would be the proper measure of damages. * * *" 35 F.Supp. at pages 996, 997.

Despite my respect for the majority judges in the Collins case, and other courts which have approved their opinions, usually without discussion, I believe that Judge Holmes adopted the sounder position.

The Collins case was cited with approval in United States v. The South Star, 2 Cir., 210 F.2d 44, affirming D.C., 115 F.Supp. 102, where one of the questions was whether a stevedore is entitled to the benefit of the one year limitation in Cogsa; in Ford Motor Co. v. Jarka Corp., Mun.Ct., 134 N.Y.S.2d 52, 1954 A.M.C. 1095 which was similar to the case at bar, and will be discussed below; and in Autobuses Modernos, S. A. v. Federal Mariner, etc., D.C.E.D.Pa.1954, 125 F.Supp. 780, 1954 A.M.C. 1650, where the question was whether the limitation of liability of the carrier and the ship extended to the owner and the charterer of the ship.

The extent of the liability of an owner or charterer is quite different from the question involved in the case at bar, as was clearly pointed out in the majority opinions of the Supreme Court of Australia in the recent case of Wilson v. Darling Island Stevedoring and Lighterage Co. Ltd., (1956) Argus Law Reports 311, 29 Australian Law Journal 740. See also Elder, Dempster & Co. Ltd. v. Paterson Zochonis & Co. Ltd., 1924 A.C. 522. The latter is a most difficult case, because the several law lords gave different reasons for their conclusions. I concur in the construction of the Elder Dempster case set out in the opinions of Fullager, J., and Kitto, J., in Wilson v. Darling Island Stevedoring and Lighterage Co. Ltd., supra. The limitation of liability granted to a ship would be of little value if it could be avoided by the simple expedient of suing her owner *in personam.*

In Ford Motor Co. v. Jarka Corp., supra, besides citing the Collins case, and refusing to give any weight to Reid v. Fargo, the judge of the Municipal Court cited with approval two cases decided in New South Wales, one by a nisi prius court, Waters Trading Co. Ltd. v. Dalgety & Co. Ltd., (1951) 2 Ll.Rep. 385, and one by the Supreme Court of New South Wales, Gilbert Stokes and Kerr Prop. Ltd. v. Dalgety & Co. Ltd., (1948) 81 Ll.L.Rep. 337. The two New South Wales cases, however, have now been overruled by the Supreme Court of Australia. Wilson v. Darling Island Stevedoring and Lighterage Co. Ltd., supra. The opinions in the latter case are quite long and discuss all of the relevant British cases. Fullager, J., in an opinion with which Dixon, C. J., agreed, said:

> " * * * What has been supposed to be a principle involved in the Elder Dempster case (although there is a conspicuous lack of unanimity as to what that principle really is) has, as will be seen, been extended so as to give to a stevedore exemption from liability for negligence by virtue of a provision in a bill of lading to which the stevedore is not a party, and which is really no concern whatever of the stevedore. This appears to me to be a 'development' of the common law which is altogether out of character, and which is exactly the opposite of what one would have expected and felt to be justified. It is all the more remarkable in view of the fact that the modern tendency has been to expand the field of liability in tort. The common law has, I think, from quite early times—consistently with its general policy of freedom of contract—allowed the validity of provisions in a contract which limit or exclude liability for negligence. But it has always frowned upon such provisions and insisted on construing them strictly. * * * "

In disposing of the opinion of Owen, J., in the Gilbert Stokes case, Judge Fullager said:

> "The second comment is that his Honour, at the beginning of his judgment speaks as if the cargo-owner was doing something slightly disreputable in attempting 'to avoid the exceptions and limitations contained in the bill of lading' by bringing an action of tort against the persons who, by their negligent acts, had damaged his goods. I am, as I have indicated above, unable to understand this approach, which seems to me to be wrong and alien to the whole spirit of the common law. A sounder approach would be made in such a case as the Gilbert Stokes Case by asking why a self-confessed tortfeasor should be allowed to shelter behind a document which is not, and never was, any concern of his."

The concurring opinion of Judge Kitto in Wilson v. Darling Island etc. Ltd. said:

> " * * * It is true that, having regard both to the nature of the services contracted for and to the corporate character of the carrier, the inference is inescapable that both parties contemplated that the carrier would perform its obligation through servants or other persons engaged for the purpose and that the operations involved in the process described in the case stated as sorting, stacking and storing of the cargo after discharge at the port of destination was an operation naturally to be performed through the agency of stevedores. A necessity for the carrier to depend upon others to perform his obligations under the contract suggests a strong reason why he should have desired to stipulate for immunity for himself from liability for loss or damage in the course of the performance of those obligations. But there is no such readily discernible reason why he should concern himself to make, or should be understood as making, a similar stipulation for the benefit of those whom he should engage as servants, stevedores and the like and still less is there any ground for

understanding the consignor as conceding immunity to such persons. The train of thought of which the exemption clause is a natural expression is that, since the carrier has no alternative but to rely upon others to do the work involved in producing the result contracted for, it is mutually agreeable that he should not have to bear responsibility for any failure of theirs to observe proper standards in the work they do, but that the consignor shall look to them alone to make good any loss or damage which their defaults may cause."

Judge Kitto cited with approval the dissenting opinion of Judge Holmes in Collins v. Panama R. Co., supra.

I conclude that neither (A) the contract between the shipper and the carrier, nor (B) Cogsa, extends to the stevedore in this case the $500 limitation of liability.